## McCURDY, COUNTY TREASURER OF OSAGE COUNTY, OKLAHOMA, ET AL. *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF OKLAHOMA.

No. 685.  Argued January 18, 1918.—Decided March 4, 1918.

Whether, in view of the limitations of Art. IV, § 3, and the Ninth and Tenth Amendments of the Constitution, Congress has power to exempt from state taxation land purchased for a tribal Indian which when acquired was part of the mass of private property subject to the state taxing power and jurisdiction, is a substantial constitu-

tional question, affording ground, if.properly raised, for direct appeal from a decree of the District Court.

Upon a direct appeal from the District Court, based upon a constitutional question, all questions involved are open for review and there is no occasion to consider the constitutional question if the case may be disposed of on other grounds.

The Acts of June 28, 1906, c. 3572, 34 Stat. 539, and April 18, 1912, c. 83, 37 Stat. 86, respecting the Osage Indians, do not authorize the Secretary of the Interior to impose restrictions upon private land purchased for a non-competent Osage allottee with his trust money, previously released under § 5 of the latter act, and thus exempt it as a governmental instrumentality, during such restraint, from the power of the State of Oklahoma to tax it and to sell it for the collection of such taxes. *United States* v. *Rickert*, 188 U. S. 432, distinguished.

The land was originally part of the Osage Reservation but had been sold under the Osage Townsite Act, and for some years had been part of the private land in the State and had been taxed as such. The taxes in question were imposed after the purchase for the allottee and attempted imposition of restrictions.

Section 5 of the Act of April 18, 1912, *supra*, authorizing the Secretary of the Interior in his discretion and under rules and regulations to be prescribed by him to pay to any Osage allottee all or any part of the funds held for his benefit when satisfied that the allottee is competent or that the payment would be to his manifest best interests and welfare, and the regulations issued thereunder dated June 26, 1912, both contemplate supervision of the expenditure of the money but not control of property for which the money may be expended. In this case, moreover, where the land purchased was first conveyed to a trustee for the allottee and another, the terms of the trust not here appearing, and later was deeded by the trustee to the allottee with an expressed restriction on alienation, *non constat* that the restriction was a continuation of control reserved by the Secretary rather than an assumption of control of part of the Indian's estate theretofore freed.

Reversed.

THE case is stated in the opinion.

*Mr. Preston A. Shinn* for appellants.

*Mr. Assistant Attorney General Kearful* for the United States.

Mr. Justice Brandeis delivered the opinion of the court.

The Osage Tribe of Indians consisted in 1906 of two thousand persons. Their reservation, located in Oklahoma Territory between the Arkansas River and the Kansas state line, contained about a million and a half acres of fertile well-watered prairie land and of heavily timbered hill lands, largely underlaid with petroleum, natural gas, coal and other minerals. At that time the United States held for the tribe a trust fund of $8,373,658.54, received under various treaties as compensation for relinquishing other lands. The annual income of the tribe from interest on this trust fund and from rentals of grazing, oil, and gas lands was nearly $1,000,000; that is $500 for every man, woman and child, in addition to the earnings of individuals.[1] Congress, concluding apparently that the enjoyment of wealth without responsibility was demoralizing to the Osages, decided upon the policy of gradual emancipation. By Act of June 28, 1906, 34 Stat. 539, it provided for an equal division among them of the trust fund and the lands. The trust fund was to be divided by placing to the credit of each member of the tribe his pro rata share which should thereafter be held for the benefit of himself and his heirs for the period of twenty-five years and then paid over to them respectively (§§ 4 and 5).[2]

---

[1] Annual Reports, Dept. Interior (1905), pp. 306–312; (1906), pp. 448, 451.

[2] Sec. 4. That all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States for the period of twenty-five years from and after the first day of January, nineteen hundred and seven, except as herein provided: . . . .

Sec. 5. That at the expiration of the period of twenty-five years from and after the first day of January, nineteen hundred and seven, the lands, mineral interests, and moneys, herein provided for and held in

The lands were to be divided by giving to each member
the right to make, from the tribal lands, three selections
of 160 acres each and to designate which of these should
constitute his homestead. A commission was appointed
to divide among the members also the remaining lands,
after setting aside enough for county use, school-sites and
other small reservations. The oil, gas, coal and other
mineral rights were reserved to the tribe for the period
of twenty-five years with provision for leasing the same.
The homesteads were made inalienable and non-taxable
for twenty-five years or until otherwise provided by Con-
gress. All other allotted lands—which were known as
"surplus lands," were made inalienable for twenty-five
years and non-taxable for three years, except that power
was vested with the Secretary of the Interior to issue to
any adult member, upon his petition, a certificate of com-
petency, authorizing him to sell all of his surplus lands;
and upon its issue all his surplus lands became imme-
diately taxable. By Act of April 18, 1912, § 5,[1] 37 Stat.

trust by the United States shall be the absolute property of the in-
dividual members of the Osage tribe, according to the roll herein pro-
vided for, or their heirs, as herein provided, and deeds to said lands
shall be issued to said members, or to their heirs, as herein provided,
and said moneys shall be distributed to said members, or to their heirs,
as herein provided, and said members shall have full control of said
lands, moneys, and mineral interests, except as hereinbefore provided.

[1] Act of April 18, 1912, § 5:

Sec. 5. That the Secretary of the Interior, in his discretion, hereby
is authorized, under rules and regulations to be prescribed by him and
upon application therefor, to pay to Osage allottees, including the blind,
insane, crippled, aged, or helpless, all or part of the funds in the Treas-
ury of the United States to their individual credit: *Provided*, That he
shall be first satisfied of the competency of the allottee or that the
release of said individual trust funds would be to the manifest best in-
terests and welfare of the allottee: *Provided further*, That no trust
funds of a minor or a person above mentioned who is incompetent shall
be released and paid over except to a guardian of such person duly
appointed by the proper court and after the filing by such guardian

86, 87, Congress authorized the Secretary of the Interior
to pay to any Osage allottee "in his discretion" "under
rules and regulations to be prescribed by him and upon
application therefor" all or part of the funds held for his
benefit, provided the Secretary is satisfied either that the
allottee is competent or that such payment would be to
"the manifest best interests and welfare of the allottee."

In 1913 (apparently in March), the Secretary paid from
the principal of the trust funds held for Robert Panther,
a non-competent [1] allottee, the sum of $1,750, which was
applied in payment for a lot of land in the City of Paw-
huska. The land when purchased was conveyed to one
Brenner as trustee for Robert and Emma Panther, but
soon after was conveyed by Brenner to Robert individ-
ually. The deed to Robert contained the following clause:

"This conveyance is made and accepted with the under-
standing, and under the condition that the above described
property is to be and remain inalienable and not subject
to transfer, sale or incumbrance for a period of eighteen
years from the 1st day of July, 1913, except by and with
the express consent and approval of the Secretary of the
Interior, or his successor in office."

The land was originally a part of the Osage Reservation
and became part of Pawhuska when that town was estab-
lished under the Osage Townsite Act (March 3, 1905, 33
Stat. 1061). When Oklahoma was admitted into the
Union in 1907, the town became the City of Pawhuska
and a part of Osage County. The land had passed into
private ownership before 1908, became taxable then under
the laws of Oklahoma and taxes were assessed thereon and

and approval by the court of a sufficient bond conditioned to faithfully
administer the funds released and the avails thereof.

[1] Act of April 18, 1912, § 9:

Sec. 9. The word "competent," as used in this Act, shall mean a per-
son to whom a certificate has been issued authorizing alienation of all
lands comprising his allotment, except his homestead.

were paid until about the time of the conveyance to
Brenner in trust for the Panthers. Then default was
made and the land was sold by the county treasurer for
failure to pay taxes for the second half of 1912.

In January, 1917, the United States tendered to the
holder of the tax certificate and to the county treasurer
the amount of the 1912 and 1913 taxes and penalties and
demanded a redemption receipt. The tender was refused,
because it did not include the taxes and penalties for 1914,
1915 and 1916; and the county treasurer gave notice of
intention to issue the tax deed. Thereupon the United
States filed, in the federal District Court for the Western
District of Oklahoma, this suit against the county treas-
urer for an injunction to restrain the issue of the tax deed.
The Government contended, that as the land had been
bought for Panther and was by deed made inalienable
without the consent of the Secretary of Interior, it was
while so held an instrumentality lawfully employed by the
Government for the protection of an Indian and as such
exempt from taxation by the State or any subdivision
thereof. On the other hand the county treasurer and the
city (which was permitted to intervene) contended that
Congress had not authorized the Secretary of the Interior
to invest the trust fund for the Indians' benefit or to im-
pose restriction on alienation of property purchased with
money from that source; that the insertion in the deed
of the provision against alienation did not have the effect
of exempting the land from taxation by the State; and
that it was not the intention of Congress to do so. It was
also contended that such exemption was not within the
powers of Congress as limited by Article IV, § 3, and the
Ninth and Tenth Amendments of the Constitution; since
before imposing the restriction by deed, the land had be-
come a part of the private property subject to the jurisdic-
tion of the State. A decree was entered granting, in effect,
an injunction against taxation during the period of restric-

tion of alienation; and the case is brought here on direct appeal under § 238 of the Judicial Code, on the ground that constitutional questions are involved.

The jurisdiction of this court was questioned; but the case is properly here. The constitutional question is substantial, was properly raised below, and was passed upon there. We have, however, no occasion to consider it; since all questions involved in the case are before us, *Northwestern Laundry* v. *Des Moines,* 239 U. S. 486, 491, and there are other grounds on which the decree must be reversed.

· · Under the Act of June 28, 1906, the Secretary of the Interior had no authority to release or to invest any part of the principal of the trust fund held for Panther. His authority to release rests wholly upon § 5 of the Act of April 18, 1912. That section confers upon him, if application is made therefor, discretion whether to release or to withhold. If the release "would be to the manifest best interests and welfare of the allottee" it may be made although the allottee is not competent, as that term is defined in § 9 of the act. The Secretary is authorized to prescribe the rules and regulations under which such releases shall be made; but he is not given authority to exercise control of any property in which the funds released may thereafter be invested, or otherwise to create with the released funds a governmental instrumentality for the protection of the Osages. Congress apparently believed that, in order to prepare the Indian for complete independence, he must be educated in self-control, and that this could best be done by committing to him gradually the care of his property. That course necessarily involved the risk of some property being lost through improvidence. But in the case of the Osages the risk was not attended by serious danger. Even if the whole trust fund should be released and, despite supervision, improvidently spent, the legally competent allottee would

still have his homestead and his share in valuable un-
divided oil, gas and coal rights; and the legally incom-
petent, his surplus lands in addition.  There is nothing
in the act or in the facts to which it applies that indicates
a purpose to extend governmental control to property
in which released funds may be invested.  And there are
in both the Act of 1906 and in that of 1912 provisions
which show that Congress intended to restrict the tax
exemption.  By § 2 of the Act of 1906 the surplus lands be-
came taxable after three years, even if they remained
inalienable.  By § 7 of the Act of 1912 both the lands and
funds of allottees or their heirs are protected against
claims arising prior to competency, inheritance or removal
of restrictions; but it is expressly provided "That nothing
herein shall be construed so as to exempt any such prop-
erty from liability for taxes."

The regulations issued under date of June 26, 1912,
afford no support to the Government's contention.  They
provide, among other things, that:

(a) "One who has not received a certificate of com-
petency, but who has made good use of all moneys paid
to him and has properly used the lands and rentals under
his control belonging to his minor children may be con-
sidered competent to handle his trust funds."

(b) (In case of adults neither aged, physically disabled,
nor incompetent to a degree requiring legal guardianship,
the applicant must agree) "to abide by a stipulation in
the claim that the money is to be deposited in bank to his
credit and expended under the supervision of the super-
intendent, subject to instructions from the Indian Office,
if the Secretary of the Interior so directs."

Like the act under which they are framed, these regula-
tions contemplate supervision of the expenditure of money,
not control of the property, if any, for which the money
is expended.  They tend to confirm the contention of the
appellants that after the money is paid out of the bank it

and property in which it may be invested are to be free
from any restriction.  Under the Act of 1906, the Secre-
tary of the Interior when applied to for a certificate of
competency was confronted with serious alternatives.
If he issued the certificate, all the allottee's surplus lands—
about 495 acres [1]—would at one time be freed from re-
strictions on alienation and become subject to disposition
by him without governmental control.  If the Secretary
refused to issue the certificate, the allottee would (unless
the certificate were granted later) remain, until the end
of the twenty-five year period, in the enjoyment of the
income merely; and at the end of that period, he or
his heirs though unaccustomed to the control of prop-
erty, would get absolute dominion at one time over
the (a) homestead, (b) surplus lands, (c) the trust fund
($3,928.50),[2] and (d) his share of the interest in the oil,
gas, coal and mineral rights.  The Act of 1912 made
possible the release of parts of the trust fund from time
to time.  The risks to be incurred at any one time could
be made quantitatively as small as the Secretary of the
Interior might deem advisable; and by the regulations
the risk was reduced in degree, by virtue of the require-
ment that the money must be "deposited in bank and
expended under supervision of the superintendent, sub-
ject to instructions from the Indian Office, if the Secretary
of the Interior so directs."  The policy of education and
development through the bank account had been tried
and found promising.[3]  The regulations greatly extended

[1] Report of Com. of Indian Affairs (1912), p. 63.

[2] Report of Com. of Indian Affairs (1910), p. 47.

[3] Report of the Com. of Indian Affairs (1912), pp. 64, 66: "As
the keynote of Indian progress has been individualism, perhaps the
most effective general action taken during the fiscal year was the send-
ing of a personal letter to each superintendent handling individual
Indian funds in order to impress upon his mind a most important con-
sideration—that the funds of an able-bodied Indian should be handled
in such a way as not to weaken his moral stamina as a man."

the field of operation by providing that one legally incompetent might get such release where he had made good use of the moneys theretofore paid him or of the lands under his control. It is education through the responsibility for spending, not the property purchased with released moneys, which constitutes the instrumentality employed by the Government in fitting the individual Osage Indian to take his full part as a citizen of the United States.

Furthermore, in the case at bar it is not shown that the money released from the trust was invested directly in property restricted as to alienation. Apparently Panther's money had been released six months before the deed to him was executed and was used to pay for a conveyance of the land to Brenner, as trustee for Robert and Emma Panther. What the terms of the trust were, does not appear. But there is nothing in the record to indicate that a restriction upon the alienation of the land was among them or that the Secretary of the Interior expressly reserved control over the property or its proceeds. It may well be that the Commissioner of Indian Affairs then believed that an ordinary trust of the property for a short period would best advance the interests of Panther. It is consistent with the facts shown that the restriction upon alienation inserted in the deed was not a continuation of control reserved by the Secretary of the Interior, but a bringing under his control of a part of Panther's estate theretofore freed. In this respect and others the present case differs from *United States* v. *Thurston County,* 143 Fed. Rep. 287, much relied upon by the Government. There is also a clear distinction between the present case and those like *United States* v. *Rickert,* 188 U. S. 432, where it was sought to tax property, the legal title of which was in the United States and which was held by it for the benefit of Indians.[1]

---

[1] See *United States* v. *Pearson,* 231 Fed. Rep. 270.

While an Indian is still a ward of the Nation, there is power in Congress even to reimpose restrictions on property already freed; *Brader* v. *James,* decided this day, *ante,* 88: but Congress did not confer upon the Secretary of the Interior authority to exercise such power under the circumstances of this case or to give to property purchased with released funds immunity from state taxation.

The decree is reversed with directions to dismiss the bill.

*Reversed.*