## UNITED STATES v. GETZELMAN et al.

### No. 1450.

Circuit Court of Appeals, Tenth Circuit.

April 5, 1937.

Wade H. Loofbourrow, Asst. U. S. Atty., of Oklahoma City, Okl., and Pedro Capo-Rodriguez, of Washington, D. C.

(Harry W. Blair, Asst. Atty. Gen., and William C. Lewis, U. S. Atty., on the brief), for the United States.

N. A. Gibson and Summers Hardy, both of Tulsa, Okl. (Edward H. Chandler, Paul B. Mason and Wm. O. Beall, all of Tulsa, Okl., on the brief), for appellees Sinclair Prairie Oil Co. and Commonwealth Oil & Gas Co.

N. A. Gibson, of Tulsa, Okl. (Wilbur J. Holleman, of Tulsa, Okl., on the brief), for appellee Petro Royalty Corporation.

N. E. McNeill, of Tulsa, Okl., for appellees Nat Williams, B. C. Getzelman, and Wilhelmina Worley.

N.-E. McNeill, of Tulsa, Okl. (Charles E. Wells, of Shawnee, Okl., and Benj. Mossman, of Tulsa, Okl., on the brief), for appellees B. C. Getzelman, Investors Royalty Co., and Sneed Royalty Co.

Roscoe E. Harper and Gentry Lee, both of Tulsa, Okl., for appellee J. H. Boyle.

R. H. Hudson, of Bartlesville, Okl., and R. B. F. Hummer, of Oklahoma City, Okl., for appellee Independent Natural Gas Co.

G. C. Spillers, of Tulsa, Okl., for appellee Imperial Royalties Co.

R. C. Gwilliam and A. G. Cochran, both of Tulsa, Okl., for appellee Mid-Kansas Oil & Gas Co.

Thos. F. Shea, of Tulsa, Okl., for appellee W. C. McBride, Inc.

A. D. Cochran and E. T. Noble, both of Okmulgee, Okl., for appellees Reynolds Oil & Royalty Co. and B. J. Badger and Central National Bank of Okmulgee, Okl., joint executors of the estate of Carl W. Wangerien.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

The United States instituted this action in its own behalf and as guardian for Mary Bruno, née Vieux, to quiet title to the south half of the northwest quarter of section 25, in township 7 north of range 4 east, in Pottawatomie county, Okl.; to remove cloud by canceling of record certain deeds, mineral leases, and assignments of leases and royalties; and for an accounting for the oil and gas extracted from such land.

The amended bill set forth these facts: John Bruno and Mary Vieux, Pottawatomie Indians in Oklahoma, were married in January, 1892; and they are still husband and

wife. The Commissioner of Indian Affairs filed two schedules of allotments with the Secretary of the Interior dated September 15, 1891, and the Secretary approved the first on the following day. It contained an allotment to John of 320 acres, which included all of the northwest quarter of such section 25. A trust patent issued to him on January 19, 1892. The other schedule contained an allotment to Mary of 120 acres, which included the northwest quarter of the southeast quarter, and the southwest quarter of the northeast quarter of section 26, in township 11 north of range 2 east. A trust patent was later issued and delivered to her, but the respective dates are not shown; and it was thereafter destroyed by fire. Each patent contained a provision that the United States would hold the land in trust for a period of twenty-five years in accordance with the requirements of the General Allotment Act of February 8, 1887 (24 Stat. 389, § 5 [25 U.S.C.A. § 348]). The two allotments were about 40 miles apart.

Some time prior to March 19, 1903, John had with the approval of the Secretary sold and made disposition of all the land allotted to him, except the northwest quarter of section 25; and Mary had made disposition in like manner of all the land allotted to her, except the previously described 80 acres in section 26. In order that their allotments might be contiguous and that John's might be improved it was mutually agreed by all parties concerned, with the approval of the Superintendent of the Agency, that Mary should convey her 80-acre tract in section 26 to W. L. Chapman for a consideration of $625; that John should convey the south half of the northwest quarter of section 25 to Mary; and that the money to be paid by Chapman should be used to improve the remaining 80 acres belonging to John. Mary and John joined in a deed to Chapman, and John executed a deed to Mary, both conveyances being dated March 19, 1903. The one from John to Mary recited that the land conveyed was a part of the original allotment to John; that it was intended to become and be the homestead of Mary instead of her original allotment in section 26; and that John retained the adjoining north half of the quarter section as a homestead. Before the superintendent forwarded the deeds for the approval of the Secretary, he satisfied himself, through official communications relating to other transactions, that the

agreement could not be effected in that manner; that under applicable provisions of law it would be necessary for John to surrender his patent, relinquish his interest in the entire northwest quarter of section 25 with request that a new patent issue to him for the north half of the tract and a patent issue to Mary for the south half. John executed such a relinquishment and request indorsed on the back of the patent, and the superintendent appended thereto his written recommendation that it be complied with. That was done on June 17, 1903, and the superintendent forwarded the patent to the Commissioner on the same day. On July 23d thereafter the Assistant Secretary canceled the patent as to the land in section 25 and transmitted it to the Commissioner of the General Office, with directions that such cancellation be noted on the official records and that new patents issue as requested. The cancellation was noted on October 13th, and on June 22, 1904, new trust patents were issued, one to John for the north half and one to Mary for the south half of the tract. Each contained a trust provision identical with that inserted in the original patents. The patents were accepted; the trust period was extended from time to time by executive order of the President; and it is still in effect.

On June 20, 1903, the superintendent forwarded the deed from Mary and John to Chapman to the Commissioner for the approval of the Secretary. After being returned to the superintendent for proper certification concerning the authority of the notary to take acknowledgments, the superintendent again forwarded it to the Commissioner on August 10, 1903, for such approval. Through inadvertence, the deed from John to Mary was also transmitted. The Commissioner returned both to the superintendent on October 29th, with request for explanation concerning certain features of the situation. On November 6th, the superintendent again forwarded them to the Commissioner with the requested explanation. The Commissioner transmitted them to the Secretary on November 19th, with a letter of explanation and request that they be approved. It was stated in the letter that John's patent had been canceled and that directions had been given to cause new patents to issue as requested. The Assistant Secretary duly and regularly approved both deeds in writing on November 21st. The deed to Chapman was delivered on December 29th; the agreed

sum of $625 was paid to John; and he gave a receipt for it. The deed from John to Mary was recorded in the deed records of Pottawatomie county on March 4, 1904.

John and Mary executed a mortgage to George C. Boggs in 1904, covering the tract which John had conveyed to Mary, being the land in controversy. The mortgage was afterwards foreclosed and a sheriff's deed issued to Getzelman in 1912. The defendants deraign their respective interest from that source. Certain defendants discovered oil and gas on the land and have extracted large quantities; the extraction continues and all revenues therefrom are being withheld from the United States and its ward.

Motions were interposed to dismiss the amended pleading on the ground that it failed to state an enforceable cause of action; and that the asserted cause was barred by limitation and laches. One defendant filed an answer setting up three defenses in the nature of pleas in bar, copies of certain official correspondence in the Department of the Interior being attached. A demurrer was lodged against the answer. The court sustained the motions and dismissed the action. The appeal is from that decree.

The land was in the possession of some of the defendants at the time the suit was filed. Perhaps the exercise of the equity jurisdiction of the court below was subject to challenge on the ground that a plain, adequate, and complete remedy existed at law in ejectment. See Whitehead v. Shattuck, 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873; Black v. Jackson, 177 U.S. 349, 363, 364, 20 S.Ct. 648, 44 L.Ed. 801; Lancaster v. Kathleen Oil Co., 241 U.S. 551, 36 S.Ct. 711, 60 L.Ed. 1161; Rocky Mountain Fuel Co. v. New Standard Coal Mining Co., 89 F.(2d) 147 (C.C.A.10th); Ewert v. Robinson (C.C.A.) 289 F. 740, 35 A.L.R. 219. It has been held that an action of this kind is within the jurisdiction, meaning the power, of a federal court sitting in equity, Twist v. Prairie Oil Co., 274 U.S. 684, 47 S.Ct. 755, 71 L.Ed. 1297; and that, where the court has jurisdiction of the subject matter and the parties, failure seasonably to raise the question of a plain and adequate remedy at law constitutes a waiver of it. Twist v. Prairie Oil Co., supra; Duignan v. United States, 274 U.S. 195, 47 S.Ct. 566, 71 L. Ed. 996; Lyons Milling Co. v. Goffe & Carkener (C.C.A.) 46 F.(2d) 241, 83 A.L.R. 501; City of Omaha v. Venner (C.C.A.) 243 F. 107; Fay v. Hill (C.C.A.) 249 F. 415. The parties failed to raise the question either in the court below or here. Accordingly, we refrain from deciding it, and proceed to the merits.

The decisive question presented is the source from which Mary acquired title. If it came through the deed from John, restriction against alienation was extinguished, the mortgage to Boggs was valid, and the rights of the defendants must be sustained. If it came through the patent of June 22, 1904, the land was inalienable for a period of twenty-five years from that date, the mortgage was invalid, and the subsequently executed instruments under which defendants hold must be canceled.

It is expressly provided in section 5 of the General Allotment Act of 1887 that upon the approval of allotments therein authorized trust patents shall issue containing a provision that the United States will hold the land in trust for a period of twenty-five years; that at the expiration of such period it will be conveyed to the allottee or his heirs discharged of such trust and free of charge or incumbrances; and that any conveyance or contract of conveyance made during that period shall be void. It is further provided that the President shall have power in his discretion to extend the trust period. 24 Stat. 388, 389 (25 U.S.C. A. § 348). Allotments to the members of the Pottawatomie Tribe in accordance with the terms of that act were specifically authorized and expressly confirmed in 1891. 26 Stat. 989, 1017. The original trust patents to John and Mary for their respective allotments were issued under these provisions of law. The equitable title thereupon passed to the allottees, while the legal title remained in the United States in trust for their use and benefit. United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532; Hallowell v. Commons (C.C.A.) 210 F. 793. But the restriction against alienation was modified in 1894. It was then provided that any member of the Band more than twenty-one years of age to whom a trust patent had been issued under the provisions of the General Allotment Act could sell and convey any portion of the land allotted to him, but such a deed of conveyance was made subject to the approval of the Secretary of the Interior; and that land sold and conveyed in that manner should be subject to taxation as other lands from and after the recordation of the deed. 28 Stat. 286, 295. The deed

from John to Mary was approved by the Secretary in November, 1903; and John, more than twenty-one years of age, still had 80 acres of his allotment. Accordingly, the deed met all of the requirements of the statute, and the restricted Indian title was thereupon extinguished unless the previous surrender of the patent and relinquishment of the title, and the subsequent issuance of the restricted patent to Mary, effected a different result.

■ The original patent to John was relinquished and canceled and new patents were issued under authority believed to have been granted by the Act of October 19, 1888 (25 Stat. 611). It is provided in section 2 of that act (25 U.S.C.A. § 350) that the Secretary is authorized, in his discretion and when deemed for the best interest of the Indian, to permit any Indian to whom a patent has issued for land on the reservation to which he belongs, to surrender such patent with a formal relinquishment indorsed thereon; and to cancel such patent, provided the Indian shall make a lieu selection of other land and receive a patent for it under the provisions of the General Allotment Act. The plain language of the statute indicates that it is intended to effect a change in allotments; that is, to acquire other and different land when that is deemed for the best interest of the Indians. And that conclusion finds support in the history of the act. It originated in the Department of the Interior. The Secretary wrote the President pro tempore of the Senate on June 7, 1888, transmitting a proposed draft of a resolution. The letter recited that four members of the Sisseton and Wahpeton Indians on the Lake Traverse Reservation, in South Dakota, who had obtained allotments under the General Allotment Act, desired to make changes because it had been discovered that in three of these cases the lands allotted were not the lands on which the allottees lived and had made improvements, and in the fourth case the land allotted was not desirable farm land; that steps had been taken to effect relinquishment and new allotments; and that on further investigation it was found that no statutory authority existed for action of that kind. It was further stated that similar cases would likely arise on other reservations; and that for such reason the proposed resolution had been prepared and was transmitted with recommendation that it be passed. The proposed legislation was amended in form from a resolution to an act, and enacted into law. It thus clearly appears that the contemplated object, purpose, and function of the act is to enable an Indian allottee to whom a patent has been issued to make relinquishment and secure other and different land in lieu thereof. It was never intended as a means through which an agreement of the kind outlined in the bill before us could be achieved. The relinquishment of the patent was not for the purpose of enabling John to acquire other and different land more suited and better adapted to his uses and purposes. It was not intended to enable Mary to relinquish the remaining 80 acres of her original allotment and acquire a new allotment for other and different land in lieu of it. The purpose was to enable John to convey 80 acres of his remaining land, to acquire a new patent for the other 80 acres which he already owned, and to receive the $625 from Chapman to be used in making improvements on his remaining 80-acre tract; and further to enable Mary to part with the last 80 acres of her original allotment by conveying it to Chapman and at the same time to acquire 80 acres of the land originally allotted to John. A transaction of that kind falls well outside the intended scope, purpose, and function of the act permitting relinquishment and lieu allotments. In the absence of express authority granted by statute, the Secretary has no power to cancel a patent which has been regularly issued and delivered. See Ballinger v. United States ex rel. Frost, 216 U.S. 240, 30 S.Ct. 338, 54 L.Ed. 464; United States v. Dowden (C.C.A.) 220 F. 277. Measured by the doctrine announced in these cases, it is manifest that the Secretary was without power to cancel the patent for the purpose of accomplishing the unauthorized end.

■ The deed from John to Mary preceded the relinquishment of the patent by about three months. It was approved after the patent had been relinquished, but, as between the United States and Mary as well as those who hold under her, the approval was retroactive and related back to the date of the deed, that is, March 19, 1903. Pickering v. Lomax, 145 U.S. 310, 12 S.Ct. 860, 36 L.Ed. 716; Lomax v. Pickering, 173 U.S. 26, 19 S.Ct. 416, 43 L.Ed. 601; Lykins v. McGrath, 184 U.S. 169, 22 S.Ct. 450, 46 L.Ed. 485; Harris v. Bell, 254 U.S. 103, 41 S.Ct. 49, 65 L.Ed. 159; Hallam v. Commerce Mining & Royalty Co. (C.C.A.) 49 F.(2d) 103; Anchor Oil Co. v. Gray (C. C.A.) 257 F. 277; Hampton v. Ewert (C.

C.A.) 22 F.(2d) 81. It could not operate retroactively if that would have the effect of taking away rights of third persons acquired in good faith during the intervening time. But the application of the doctrine of relation has no such effect here.

■■ Furthermore, the deed with the approval of the Secretary thereon was filed for record, and before the new patents were issued John and Mary executed and delivered the mortgage to Boggs for a valuable consideration. The mortgage was duly foreclosed. Getzelman purchased at the sale and received a sheriff's deed. The defendants claim under him. John and Mary sought without avail to have the foreclosure proceedings canceled and to quiet title, contending that Mary acquired the land through the trust patent, and therefore it was inalienable at the time the mortgage was executed. The final adverse adjudication in that action was rendered in 1918. Bruno v. Getzelman et al., 70 Okl. 143, 173 P. 850. The Secretary and the Commissioner construed the deed and its approval as having effectively extinguished the restricted status of the land. The defendants were in open and notorious possession of the land for many years prior to the institution of this action, and during that time they developed oil and gas on it. They acquired their rights and carried on development in good faith, without actual notice that the United States asserted the claim which is now ·urged.

Stress is laid upon the recital in the deed from John to Mary that the land conveyed was a part of the original allotment to John; that it was intended to become and be the homestead of Mary instead of her original allotment in section 26; and that John retained the adjoining tract of 80 acres as a homestead. Neither the General Allotment Act of 1887, nor the act of 1894 permitting members of the Pottawatomie Tribe to sell land allotted to them in excess of 80 acres, designates any part of the allotment as a homestead in distinction from the remainder. No special restrictions are placed upon any part of an allotment if it is designated or used as a homestead. The entire allotment is in a single class with provision that all above 80 acres may be sold with the approval of the Secretary and that the last 80 acres is not alienable in any form during the trust period, without reference to its designation or use as a homestead. The power of Congress to impose, extend, or reimpose restrictions on property of an Indian ward is plenary and not open to doubt. McCurdy v. United States, 246 U.S. 263, 38 S.Ct. 289, 62 L.Ed. 706; Taylor v. Tayrien (C.C.A.) 51 F.(2d) 884; Holmes v. United States (C.C.A.) 53 F.(2d) 960; United States v. Johnson (C.C.A.) 87 F.(2d) 155. But ordinarily the insertion of a provision against alienation in a deed conveying land to an Indian ward cannot impose restrictions unless the land is acquired with money under the supervision of the Secretary and the insertion of the provision is exacted as a condition to the use of the money for that purpose. And the provision in question did not essay to impose such a restriction. It merely recited that the land being acquired was to become and be the homestead of Mary instead of land previously allotted to her in section 26; and that John retained the adjoining tract as his homestead. It was a recital of facts and did not attempt to lay a restriction upon the right of alienation.

We think Mary acquired title through the deed from John as of March 19, 1903. The amended bill, therefore, failed to state any equity which would warrant an award of the relief sought. The decree is affirmed.