William H. BELL, Individual Trustee of the J. A. Chapman and Leta M. Chapman Charitable Trust and William H. Bell, Co-Executor of the Estate of Horace G. Barnard, deceased, Appellants,

v.

PHILLIPS PETROLEUM COMPANY, a Corporation, Appellee.

No. 52386.

Supreme Court of Oklahoma.

Feb. 23, 1982.

Rehearing Denied March 22, 1982.

A. Wayne Breeland, David B. Whitehill, Rogers & Bell, Tulsa, for appellants.

Kenneth Heady, C. J. Roberts, Bartlesville, Galen E. Ward, Don S. Zimmerman, Oklahoma City, Kane, Kane, Wilson & Mattingly, Pawhuska, for appellee.

OPALA, Justice:

The principal issue on appeal is whether regulations of the Secretary of the Interior which impress a servitude on all surface lands in Osage County in favor of Osage tribal oil-and-gas lessees for activities relating to mineral production on leased lands and thus relieve them from having to purchase right-of-way easements for crossing unleased lands amount to a constitutionally impermissible taking of property. If this issue is resolved in favor of tribal lessees, surface owners further raise the issues of [1] whether a gas purchaser is an "authorized representative" of tribal mineral lessee within the meaning of federal regulations authorizing such representative to use the surface lands for reasonable operations and [2] whether gas purchaser's proposed use of the surface is reasonably needed for its operations.

We hold that (a) the non-Indian owners acquired their title to the surface with knowledge that their lands stood burdened with the Osage mineral estate and that the surface lands were subject to the federal regulatory power of the Secretary of the Interior with respect to the minerals reserved; (b) Phillips Petroleum Company, appellee-gas purchaser, is the authorized representative of the tribal gas lessee for the purpose of marketing gas purchased at the well site and (c) surface owners have failed to establish that the pipeline sought to be laid by the gas purchaser was not reasonably required for its marketing operations.

## FACTS

The Osage Tribe of Indians [Osage Tribe] owns all the oil, gas and other minerals in Osage County. Under a gas lease granted by the Osage Tribe and approved by the Secretary of the Interior [Secretary], tribal lessees drilled a gas well and entered into a gas-purchase contract with Phillips Petroleum Company [Phillips]. The lease terms require Phillips to construct a gas gathering system.

The construction project which gave rise to this controversy was to solve a low gas pressure problem with a pipeline from the well to a central compressor. This would enable the gas to flow from the well to the line and bring the well back to a producing status. To reach the central compressor, Phillips must cross unleased Osage County surface lands owned by non-Indians.

Owners of the unleased surface lands brought suit to enjoin Phillips from laying the pipeline. Phillips counterclaimed for injunctive relief against such interference. Surface owners appeal from an injunction in favor of Phillips and from the trial court's refusal to grant them like relief.

## I.

### REGULATIONS OF THE SECRETARY OF THE INTERIOR WHICH ALLOW INGRESS AND EGRESS TO AND FROM UNLEASED SURFACE LANDS IN OSAGE COUNTY STEM FROM CONGRESSIONAL ACTS AND THE FEDERAL GOVERNMENT'S ROLE AS GUARDIAN VIS-A-VIS THE OSAGE TRIBE

Phillips' position is that it may construct a pipeline over lands not covered by the tribal lease without securing consent of the surface owners or paying a right-of-way easement. This is so because, the argument urges, federal regulations allow the mineral lessee to use so much of the surface within the Osage mineral estate perimeter as may be reasonable for its operations and marketing.

The surface owners posit that the lessee's right of ingress and egress is limited to the individual surface tracts originally allotted to each Osage Indian and does not encompass the entire mineral estate.

The federal government's regulatory authority over the Osage mineral estate is derived from congressional acts and from the government's traditional role in managing Indian affairs.

1. *Congressional Acts and Federal Regulations Affecting Surface and Mineral Rights of Osage Indians*

The Osage Indians were settled in an area purchased for them by the United States government from the Cherokee Nation. The lands were held in trust for the Osage Tribe. The tribal domain embraced an area now known as Osage County.[1] The federal government took title to the lands in trust for the use and benefit of the Osages and held the land until the passage of the Osage Allotment Act [Allotment Act] on June 28, 1906.[2] The Act provided a

---

1. Section 21 of the Enabling Act of June 16, 1906, 34 Stat. 267, directed that the Osage reservation shall constitute one county in the State of Oklahoma.

2. 34 Stat. 539. The Allotment Act specified that the land was to be allotted in severalty by giving each Osage tribal member three selections of land, each consisting of 160 acres. A good discussion of this Act is found in *McCurdy v. United States*, 246 U.S. 263, 265–266, 38

scheme for allotting Osage Indian lands to tribal members in severalty and for controlling alienation. It also reserved valuable mineral rights to the Osage Tribe for the benefit and protection of the Osage Indians. Title to surplus lands not allotted under this scheme remained in the United States to be held in trust for the Osage Tribe. The oil, gas and other minerals were severed from the surface and reserved in the Osage Tribe for 25 years.[3] A 1964 congressional enactment extended the trust span for an indefinite period.[4] The reservation in the tribe of all mineral rights operates to invest every member of the Osage Tribe in a pro-rata share or interest in the income derived from the production of oil and gas and other minerals in Osage County.[5]

The Allotment Act gave to the Secretary authority to do all things necessary to carry into effect those provisions not specifically set forth in the Act. By a 1921 act Congress provided that Osage County surface owners or their lessees shall be compensated, under rules and regulations to be drawn

by the Secretary, for damages occasioned by oil and gas mining operations.[6]

Regulations governing leases of restricted lands for farming and grazing purposes were promulgated by the Secretary soon after the passage of the Allotment Act.[7] These were later followed by regulations governing oil-and-gas operations on the Osage mineral estate.[8] Revised regulations, adopted in 1952, provided that a mineral lessee shall have the right to use "so much of the surface of the land and water on the premises, as may be necessary for operations ... also the right of ingress and egress, and rights of way to any point of operations under conditions of least injury and convenience ..."[9] Later amendments to these regulations in 1962 gave the lessee the right to use "so much of the surface of the land *within the Osage Reservation* as may be reasonable for operations ..." [Emphasis added]. The regulations were again revised in 1974 to allow the "authorized representative" of the tribal lessee to use

S.Ct. 289, 290, 62 L.Ed. 706 [1918]: " * * * The Osage Tribe of Indians consisted in 1906 of two thousand persons ... At that time the United States held for the tribe a trust fund of $8,373,-658.54, received under various treaties as compensation for relinquishing other lands ... Congress, concluding apparently that the enjoyment of wealth without responsibility was demoralizing to the Osages, decided upon the policy of gradual emancipation. By Act of June 28, 1906 [34 Stat. 539] it provided for an equal division among them of the trust fund and the lands. * * * The lands were to be divided by giving to each member the right to make, from the tribal lands, three selections of 160 acres each ... The oil, gas, coal and other mineral rights were reserved to the tribe for the period of twenty-five years with provision for leasing same ..."

3. The pertinent provisions of the Allotment Act by which the reservation of mineral rights was accomplished are as follows: "Oil, gas, coal *and other mineral leases. And provided further, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided: And provided further, that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said

land at the expiration of said twenty-five years, unless otherwise provided for by act of Congress."

4. 78 Stat. 1008, October 6, 1964.

5. This right of participation in the mineral rights has come to be known in legal parlance as a "headright". In defining a headright the court in *Globe Indemnity Co. v. Bruce*, 81 F.2d 143 [10th Cir. 1935] said that it is "the right to receive the trust funds and mineral interest at the end of the trust period, and during that period to participate in the distribution of bonuses and royalties accruing from the mineral estates and the interest on the trust funds."

6. 41 Stat. 1249, March 3, 1921. A 1929 congressional enactment, 45 Stat. 1478, provided that arbitration or a bona fide offer in writing to arbitrate constituted conditions precedent to the surface owner's right to sue for damages.

7. *La Motte v. U.S.*, 254 U.S. 570, 574, 41 S.Ct. 204, 206, 65 L.Ed. 410 [1920].

8. *Silurian Oil Co. v. Essley*, 54 F.2d 43 [10th Cir. 1932].

9. 25 C.F.R. 180.5, as reflected by the 1952 amendment.

so much of the surface as was necessary for reasonable operations and marketing.[10]

## 2. The Federal Government and Its Role in the Management of Indian Affairs

The basis of the federal government's power to regulate Indian affairs is found in the Indian Commerce Clause [11] and Treaty Clause [12] of the United States Constitution.[13] When Oklahoma was admitted into the Union, the federal government expressly reserved the right of exclusive control and jurisdiction over the Indians and their property.[14]

■ In its role as the constitutional protector of the Indian, the United States has "the authority to do all that was required to perform that obligation".[15] Congressional power over Indians has been described as "broad", "plenary" and "paramount".[16]

**10.** Pertinent provisions of 25 C.F.R. 183 provide:

"183.1(k) 'Authorized representative' of an oil lessee, gas lessee, or oil and gas lessee means any person, partnership, association, company, corporation, organization or agent employed by a contractor with lessee or any subcontractor to conduct oil and gas operations or provide facilities to market oil and gas." [Emphasis added].

"183.19 Use of Surface of Land. (a) Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes, but is not limited to, the right to lay and maintain pipelines, electric lines, pullrods, other appliances necessary for operation and marketing; the right-of-way for ingress and egress to any point of operations ..." [Emphasis added].

**11.** Art. I § 8, U.S.Const.

**12.** Art. VI, U.S.Const.

**13.** In Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 [1832] the federal government's power to regulate Indians was judicially recognized. Indian tribes were described in Worcester as domestic dependent nations. The Court in United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228, [1886] said: "The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection ... It must exist in that government, because it never has existed anywhere else ... and because it alone can enforce its laws on all the tribes." See also Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 [1959].

**14.** Section 1 of the Enabling Act, 34 Stat. 267, June 16, 1906 provides in pertinent part: " * * * Provided, that nothing contained in the said constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights ... which it would have been competent to make if this Act had never been passed."

The Constitution of Oklahoma in Art. 1 § 3 acknowledges the sovereignty of the United States in Indian affairs. The terms of that section provide in pertinent part: "The people ... forever disclaim all right and title ... to all lands ... owned or held by any Indian, [or] tribe ... and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States ... The disclaimer of title to lands held by Indian tribes is a continuing and binding obligation on the state after its admission into the Union in so far as it may be a matter of federal cognizance."

**15.** Board of County Commissioners v. Seber, 318 U.S. 705, 715, 63 S.Ct. 920, 926, 87 L.Ed. 1094 [1943]. The Supreme Court in United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 5, 58 L.Ed. 107 [1913] states: "Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long-continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state."

**16.** In United States v. Jackson, 280 U.S. 183, 190, 50 S.Ct. 143, 145, 74 L.Ed. 361 [1930] the Court observed: "We have had frequent occasion to point out the duty of the United States to protect its wards, the Indians, and the consequent broad extent of power over them and their affairs." On another occasion the Court stated in Winton v. Amos, 255 U.S. 373, 391, 41 S.Ct. 342, 349, 65 L.Ed. 684 [1921]: "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property."

Neither the act of conferring citizenship [17] nor that of making allotments [18] end Congress' power to protect its Indian wards or generally control their affairs.

■ Historically, the Secretary has been the delegated arm of the federal government to act as the guardian of the Indian ward and to administer the affairs incidental to this function. To that end the Secretary has been granted wide discretionary powers to be exercised in carrying out the declared congressional policy.[19] The scope of his authority includes promulgation of reasonable rules and regulations governing the leasing of Indian lands for oil-and-gas purposes. Alienation of surface rights by the transfer of Indian ownership in the surface to non-Indian status does not terminate the Secretary's authority.

■ In conformity with its policy towards Indians, the federal government undertook to impose restrictions and erect safeguards in an effort to protect the Osage mineral estate for the period of time that it was to remain in a reserved status. Implicit in the federal regulations is an imposition of the right of ingress and egress upon the unleased surface lands as a necessary incident to the Osage Tribe's exercise of its ownership in the mineral estate.

---

**17.** *Board of Commissioners of Pawnee County, Okl., v. United States,* 139 F.2d 248, 251–252 [10th Cir. 1943]; *Board of County Commissioners v. Seber,* supra note 15.

**18.** *Tiger v. Western Investment Co.,* 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 [1911]; *Williams v. Johnson,* 239 U.S. 414, 36 S.Ct. 150, 60 L.Ed. 358 [1915].

**19.** The fact that in some instances the Indians own the fee in their lands does not prevent congressional control over their property. *United States v. Sandoval,* supra note 15, *Walker v. Brown,* 43 Okl. 144, 141 P. 681, 682 [1914]; *Wrigley v. McCoy,* 73 Okl. 161, 175 P. 259, 261 [1918].

## II.

## SURFACE LANDS IN OSAGE COUNTY WERE ACQUIRED BY NON–INDIANS WITH KNOWLEDGE THAT SURFACE OVERLYING THE OSAGE MINERAL ESTATE STOOD IMPRESSED WITH A SERVITUDE

■ We next determine whether the non-Indian surface owner could have reasonably known—at the time of acquiring the surface—the extent of Indian rights in the reserved minerals and the burden they would impose on the surface overlying the tribal mineral estate. While the federal government has the power to control and manage the property and affairs of its Indian wards, that power is, of course, subject to constitutional limitations. It does not enable the government to take private property without just compensation and in violation of due process.

■ Prior to its non-Indian ownership, the land was subject to the regulatory power of the federal government in its trustee capacity *vis-a-vis* Indian rights in both the surface and mineral estates. When non-Indian surface owners first acquired title to the surface, they stood in the same footing as the predecessor Indian owner. Title to the surface land thus passed to the non-Indian owner with the knowledge that the surface stood burdened with the Osage mineral estate and was subject to the power of the Secretary to implement by reasonable rules the intent of Congress.[20] The promul-

---

**20.** In the administration of Indian affairs there are many matters not covered by a direct statute but by rules and regulations which are promulgated by the Secretary pursuant to the power conferred by statute. Where these rules and regulations do not conflict with statutes, they are given the force and effect of law and all parties are bound thereby. *U.S. v. Smull,* 236 U.S. 405, 35 S.Ct. 349, 59 L.Ed. 641 [1915]; *Sunderland v. U.S.,* 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259 [1924]; *Phillips Petroleum Co. v. Sheel,* Okl., 243 P.2d 726, 729 [1952]; *Blanset v. Cardin,* 261 F. 309, aff. 256 U.S. 319, 41 S.Ct. 519, 65 L.Ed. 950 [1921]; *Diehl v. Phillips Petroleum Co.,* Okl., 376 P.2d 203, 206 [1962].

gation of regulations which authorized a mineral lessee's ingress and egress to and from any land surface in Osage County in course of reasonable pursuit of mining operations does not invade any property right in the surface and is accomplished *sans* "taking" in the constitutional sense.

In the instant case, the surface owner doubtless had notice of the reserved mineral estate and was provided with a procedure whereby he could be compensated for damages occasioned to the surface by oil-and-gas mining operations. That procedure allowed direct access to the courts after an unsatisfactory award. The promulgation of the regulations in question was a lawful exercise of the Secretary's regulatory power.

The validity of the regulations at issue first came to be tested in a 1967 federal court case, *Appleton v. Kennedy*,[21] where the court noted that the owners of the surface acquired and owned their land with knowledge of, and subject to, the reservation of minerals in the Tribe and to the Secretary's exercise of valid rule making power. In that case the regulations under challenge were found not only reasonable but also proper for the full enjoyment of the reserved mineral estate of the Tribe and of its lessees. Reduced to simplicity, *Appleton* holds that ever since their initial alienation, the surface interests in tribal lands have stood burdened not only with the ordinary servitude for activities necessary in the exploitation of underlying minerals but also with the federal regulatory power over *all* of the reserved trust estate in the Osage minerals. Our pronouncement in the instant case is in full accord with the teaching of *Appleton*.

### III.

### GAS PURCHASER IS AN "AUTHORIZED REPRESENTATIVE" WITHIN

### MEANING OF FEDERAL REGULATIONS

The regulations, as amended in 1974, authorize the tribal lessee or his "authorized representative" to use so much of the surface within the mineral estate as is reasonable for its mining operations. An "authorized representative", as defined in the regulation, may be a corporation contracting with the lessee for the purpose of providing facilities to market oil-and-gas.[22]

Phillips contends that it is the "authorized representative" within the meaning of the federal regulation. Its authority, Phillips argues, is derived from the gas purchase contract with the tribal lessee. The contract requires Phillips to construct a gas-gathering system in order to take the gas at the well-site. The surface owners claim the term "representative", when used in its ordinary and customary meaning, refers to one who acts on behalf of another. They suggest that Phillips is acting on its own behalf and not for the lessee.

Testimony adduced by stipulation discloses that if the field solicitor for the Interior Department were present, he would testify (a) about his general familiarity with, and knowledge of, the regulations in question and (b) that because the Department interprets the term "authorized representative" to include a buyer under a gas purchase contract, the regulation, as so construed, does authorize such a purchaser to lay pipelines across lands not covered by the mining lease when it is necessary to so do in order to market the gas.

The surface owners challenge this testimony as inadmissible.

When more than one meaning may be attributed to the terms of a regulation, we look to the interpretation given to the regulation by those charged with the duty of executing it. When choosing between two or more possible meanings, controlling weight may be given to the long-continued administrative usage unless it is plainly erroneous or inconsistent with the language.[23]

---

**21.** 268 F.Supp. 22 [N.D.Okl.1967].

**22.** 25 C.F.R. 183,1(k), supra note 10.

**23.** In *Richter v. Barrett*, 173 F.2d 320, 323 [3rd Cir. 1949], the court held that a report by an administrative officer with respect to construction of a regulation, while not having the force

Deference to an agency's interpretation is even more clearly in order when the construction is that of an administrative regulation rather than a statute.[24]

██ The testimony of the field solicitor, in his capacity as a legal officer of the Interior Department, is admissible as evidence of the interpretation of the regulation by officials charged with its administration.[25] It was properly allowed for the purpose of assisting the trial court in the task of placing a construction on the regulation. The Interior Department's view of the term "representative" appears neither erroneous nor inconsistent with the wording of its regulation. We find no impediment to the admissibility of the challenged testimony nor to the meaning ascribed to the regulation.

## IV.

## THERE IS NO SHOWING THAT THE PROPOSED PIPELINE IS INCONSISTENT WITH CUSTOMARY STANDARDS OF INDUSTRY

██ Surface owners further contend the proposed pipeline is not necessary to market the gas since another method is available to Phillips which would be far less damaging to the surface. They claim irreparable injury to the soil from rock and debris to be brought forth in laying the pipeline.

The only testimony adduced on this issue was by Phillips' regional gas superintendent. It is uncontradicted in establishing the factum of low gas pressure that can be corrected by an additional pipeline. Through cross-examination, it was revealed that Phillips could reach the same result by placing a compressor at each well site but this method would be considerably more expensive and inconvenient.

Surface owners presented no witnesses in support of their contentions. They neither alleged nor produced any evidence to show that the Phillips-proposed pipeline would occasion greater injury to the surface than compressor stations located at each well site. The construction of the challenged pipeline has not been shown to be anything but usual and consistent with the customary standards of the industry. There is no indication that Phillips could have, with equal convenience and advantage, selected another method to solve the low-pressure problem. We find no merit to this argument.

Affirmed.

IRWIN, C. J., BARNES, V. C. J., and DOOLIN and HARGRAVE, JJ., concur.

SIMMS, J., dissents.

of a regulation, may be considered in the construction of the regulation. In *Woods v. Benson Hotel Corporation*, 75 F.Supp. 743, 748 [D.C.Minn.1948], the court held that although the failure properly to publish an administrative interpretation of a regulation may prevent such interpretation from becoming official, it may nevertheless be entitled to consideration as the regulatory agency's construction of the regulation.

24. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 [1945].

25. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 [1965]; *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 [1978].