OSCN Found Document:OKLA. GAS AND ELECTRIC CO. v. STATE ex rel. OKLA. CORPORATION COMMISSION

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 OKLA. GAS AND ELECTRIC CO. v. STATE ex rel. OKLA. CORPORATION COMMISSION
2023 OK 33
Case Number: 117896; Cons. w/117902
Decided: 04/04/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 33, __ P.3d __

 

 

OKLAHOMA GAS AND ELECTRIC COMPANY and ONEOK ARBUCKLE II PIPELINE, LLC, Appellants,
v.
STATE OF OKLAHOMA ex rel. OKLAHOMA CORPORATION COMMISSION, Appellee.

APPEAL FROM OKLAHOMA CORPORATION COMMISSION CAUSE NO. PUD 201800075, ORDER NO. 692718

Dana L. Murphy, Chairman, and J. Todd Hiett, Vice Chairman.

¶0 In 2018, ONEOK Arbuckle II Pipeline, LLC began construction of a natural gas liquid pipeline to transport Oklahoma production to the interstate market. The pipeline required electricity to operate a series of pump stations, including the Binger II Pump Station. The location for the proposed Binger II was in the certified territory of CKenergy Electric Cooperative, Inc., which has exclusive rights to provide electricity in the area pursuant to the Retail Electric Supplier Certified Territory Act codified at 17 O.S. 2011, § 158.21 et seq. Relying on the large-load exception to the RESCTA, 17 O.S. 2011, § 158.25(E), OG&E submitted a bid to provide service to the Binger II, which ONEOK accepted, and the parties contracted for service. CKenergy appealed this contract to the Oklahoma Corporation Commission asserting that it was a violation of its exclusive rights under the RESCTA. The Commission subsequently enjoined OG&E's service, concluding that the meaning of "extending its service" in section 158.25(E) limits the manner or mechanism which OG&E may utilize to provide service under the large-load exception. OG&E and ONEOK appealed, we retained both appeals, and consolidated the cases. We hold that section 158.25(E) allows OG&E to extend its service to large loads in the manner proposed. Therefore, the Commission's order enjoining OG&E is vacated and remanded for proceedings consistent with this opinion.

MATTER PREVIOUSLY RETAINED FOR DISPOSITION; ORDER OF THE OKLAHOMA CORPORATION COMMISSION ENJOINING OG&E IS VACATED; CAUSE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION

Clyde A. Muchmore and Melanie Wilson Rughani, Crowe & Dunlevy, PC, Oklahoma City, Oklahoma, for Appellant Oklahoma Gas and Electric Company.

William L. Humes, Oklahoma Gas and Electric Company, Oklahoma City, Oklahoma, for Appellant Oklahoma Gas and Electric Company.

David E. Keglovits, ONEOK Arbuckle II Pipeline, LLC, Tulsa, Oklahoma, for Appellant ONEOK Arbuckle II Pipeline, LLC.

W.A. Drew Edmondson, Riggs, Abney, Neal, Turpen, Orbison, Lewis, Oklahoma City, Oklahoma, for Appellant ONEOK Arbuckle II Pipeline, LLC.

Patricia L. Franz and Daniel P. Boyle, Oklahoma Corporation Commission, Oklahoma City, Oklahoma, for Appellee Oklahoma Corporation Commission.

Brian W. Hobbs, Pain Garland and Hobbs, LLP, Anadarko, Oklahoma, for CKenergy Electric Cooperative, Inc.

Deborah R. Thompson, OK Energy Firm, PLLC, Oklahoma City, Oklahoma, for Appellee CKenergy Electric Cooperative, Inc.

Jana L. Knott, Bass Law, Oklahoma City, Oklahoma, for Appellee CKenergy Electric Cooperative, Inc.

Adam J. Singer and J. Eric Turner, Derryberry & Naifeh, LLP, Oklahoma City, Oklahoma, for Oklahoma Association of Electric Cooperatives.[1]

Jon E. Brightmire and Tom Q. Ferguson, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for Amicus Curiae Public Service Company of Oklahoma.

Jack P. Fite, White, Coffey & Fite, P.C., Oklahoma City, Oklahoma, for Amicus Curiae Public Service Company of Oklahoma.

Joann S. Worthington, American Electric Power, Oklahoma City, Oklahoma, for Amicus Curiae Public Service Company of Oklahoma.

Ash Mayfield, Grand River Dam Authority, Tulsa, Oklahoma, for Amicus Curiae Grand River Dam Authority.

Brendon S. Atkinson, Atkinson Law Firm, PLLC, Enid, Oklahoma, for Amicus Curiae Oklahoma Agricultural Cooperative Council.

H. Duane Riffe, Riffe & Associates, Tulsa, Oklahoma, for Amicus Curiae Oklahoma Rural Water Association.

Clinton D. Whitworth, Whitworth, Wilson & Evans, PLLC, Edmond, Oklahoma, for Amicus Curiae Oklahoma State Union of the Farmers Educational and Co-operative Union of America, Inc.

Ericka McPherson, Oklahoma Farm Bureau, Oklahoma City, Oklahoma, for Amicus Curiae Oklahoma Farm Bureau Legal Foundation.

Gurich, J. 

¶1 This retained appeal addresses the interpretation of the "large-load" or "one megawatt" exception to the Retail Electric Supplier Certified Territory Act (RESCTA). The RESCTA, codified at 17 O.S. 2011, § 158.21 et seq., divides Oklahoma's unincorporated areas into territories which are served by retail electric suppliers which maintain the "exclusive right to furnish retail electric service to all electric-consuming facilities located within its certified territory." 17 O.S. 2011, § 158.25(A). The RESCTA provides exceptions, however, that allow other retail electric suppliers to enter these certified territories in certain circumstances:

The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S. 2011, § 158.25(E). The latter exception is known as the "large-load" or "one megawatt" exception. The present matter concerns the meaning of "extending its service" as used in the large-load exception. Although undefined in the statute, "extending its service" does not specifically restrict a retail electric supplier from using open-access transmission lines to extend its service as Oklahoma Gas & Electric ("OG&E") proposes to do here.

Facts & Procedural History

¶2 The underlying facts in this case are not in dispute. In 2018, ONEOK Arbuckle II Pipeline, LLC ("ONEOK") began building a 530-mile long pipeline to transport liquefied natural gas ("NGL") production from the South Central Oklahoma Oil Province and Sooner Trend Anadarko Canadian Kingfisher regions to Mont Belvieu, Texas. The purpose of the pipeline is to pump NGL through a series of electrically-powered pump stations, including the Binger II Pump Station ("Binger II") in Caddo County, Oklahoma. For purposes of the RESCTA, the Binger II is located in the certified territory of CKenergy Electric Cooperative, Inc. ("CKE").[2] Generally, CKE has the exclusive right to furnish all retail electric service within its certified territory, unless an exception is applicable and allows other retail electric suppliers to service the load. 17 O.S.2011, § 158.25.

¶3 CKE is a rural electric cooperative and a retail electric supplier.[3] CKE is not subject to the Commission's rate regulation, but is subject to the Commission for purposes of the RESCTA.[4] OG&E is an investor owned electric public utility and a retail electric supplier.[5] OG&E is wholly subject to the regulatory authority of the Commission.[6] For the purpose of this case, ONEOK is a rural electric customer. The Binger II is an electric-consuming facility with a connected load greater than 1,000 kilowatts of electricity and meets the requirements for a large load as contemplated by 17 O.S.2011, § 158.25(E).[7] Since the large load exception is applicable, the facility may be served by any retail supplier by extending its service. 17 O.S.2011, § 158.25(E).

¶4 Because the large load exception was applicable to the Binger II, ONEOK solicited bids from CKE and OG&E to furnish power to the Binger II. OG&E submitted a bid that was at least $5 million dollars below CKE's,[8] so ONEOK awarded OG&E the contract for service on June 13, 2018. In order to fulfill the contract, OG&E proposed to use a third-party's transmission lines to provide service to the Binger II. OG&E planned to run a high-voltage line from Western Farmers Electric Cooperative's ("WFEC") transmission lines to a new substation--which OG&E would construct--and then run low-voltage distribution lines to the Binger II.[9] OG&E intended to use this method because its own distribution lines were at least nine miles from the Binger II,[10] whereas WFEC's transmission lines ran near the Binger II. On July 3, 2018, CKE petitioned the Oklahoma Corporation Commission ("Commission") for temporary and permanent injunctive relief to enjoin OG&E from utilizing WFEC's transmission lines to provide service to the Binger II. CKE also asked for a declaratory ruling determining that 17 O.S.2011, § 158.25(E) does not allow a retail electric supplier to extend its service into another supplier's certified territory directly from its own, or third-party, transmission facilities.

¶5 As CKE's request for relief adversely affected its operations, ONEOK intervened in the case on July 17, 2018. On August 22, 2018, OG&E moved the Commission to dismiss the case. While OG&E's motion to dismiss was pending, the Commission denied CKE's motion for temporary injunctive relief on September 18, 2018. Despite an administrative law judge's recommendation to grant the dismissal, the Commission ultimately denied OG&E's motion to dismiss on November 7, 2018. The Commission held a hearing on the merits of the case on November 14, 2018. On March 12, 2019, the two-member panel of the Commission issued its order, stating the following in part:

IT IS FURTHER ORDERED that OG&E is enjoined from serving or furnishing retail electric service to the Pump Station directly from third-party transmission facilities in violation of the RESCTA.

IT IS FURTHER ORDERED that the Commission declines the request to issue a declaratory ruling as requested by CKenergy.[11]

The Commission also made specific findings that though section 158.25(E) allows an electric retail supplier to "extend" its retail distribution systems, there is a limitation on the manner in which such extension of its services may occur.[12] The Commission interpreted the phrase "extending its service" to mean the lengthening of a retail electric supplier's own retail distribution system.[13]

¶6 In accordance with Article IX, Section 21 of the Oklahoma Constitution, the Commission granted a stay of the March 12, 2019, order until final disposition on appeal and set an appeal bond. ONEOK and OG&E both appealed the Commission's injunction to this Court, and we consolidated the appeals.[14]

Standard of Review

¶7 This Court is asked to review the Commission's order enjoining OG&E from the use of third-party transmission lines. The consolidated appeals of the Commission's decision involves the statutory interpretation of 17 O.S.2011, § 158.25(E) concerning the manner or mechanism in which OG&E proposes to service the Binger II. In order to review a decision of the Commission, we must be mindful of Article IX, § 20 of the Oklahoma Constitution:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from.

Okla. Const. art. IX, § 20. "The trial court's conclusions on issues of law pertaining to the injunctive relief receive a non-deferential de novo appellate review." Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., 2022 OK 79, ¶ 24, 518 P.3d 531, 542. Statutory interpretation presents an issue of law, so the Court's de novo review is appropriate. Med. Park Tel. Co. v. Okla. Corp. Comm'n, 2019 OK 21, ¶ 17, 441 P.3d 113, 118; see also Dobson Tel. Co. v. Okla. Corp. Comm'n, 2019 OK 27, ¶ 17, 441 P.3d 147, 152. In conducting its review, the Court has plenary, independent, and non-deferential authority to determine whether the trial tribunal erred in its legal rulings. Id. See also American Airlines, Inc. v. State ex rel. Okla. Tax Comm'n, 2014 OK 95, ¶ 25, 341 P.3d 56, 62--63.

¶8 Though the Commission may be given deference in certain circumstances, it is not appropriate here. Deference to the Commission is appropriate when the Commission is: (1) acting in its area of expertise[15] or (2) applying a longstanding administrative construction of a statute.[16] Statutory interpretation does not require the Commission's special expertise, therefore no deference is owed to the Commission on that account. Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2017 OK CIV APP 16, ¶ 15, 392 P.3d 295, 303 (approved for publ'n by Okla. Sup. Ct.) (holding that construction of the statute at issue was not within the expertise of the Commission. Rather it was "simply a matter of determining what a statute means, and that is within the expertise of the courts.").[17] Further, the Commission's construction and application of 17 O.S.2011, § 158.25(E) is not longstanding and has not been uniformly applied. The Commission's construction of Section 158.25(E) is seen in this case for the first time[18] and conflicts with the Commission's previous practices.[19] Therefore, de novo review is appropriate.

Analysis

¶9 In this case, the Commission held that "extending its service" as used in the large-load exception means that OG&E must physically extend their own distribution lines and may not utilize open-access transmission lines to provide service to the Binger II in CKE's certified territory. OG&E[20] argues that "extending its service" is synonymous with furnishing service and that it should be entitled to use transmission lines to service the Binger II, just as it would in an incorporated territory. The respective sides base their arguments upon the RESCTA.

¶10 In 1971, the RESCTA was enacted to respond to the need for statewide access to reasonably affordable electric service. At the time, for-profit retail electric suppliers were serving more populated, profitable areas while leaving rural areas without adequate access to service.[21] In other areas, where multiple retail electric suppliers served in close proximity, facilities were constructed across the road from each other, leading to wasteful duplication of facilities and encumbrance of the Oklahoma landscape.[22] The RESCTA sought to rectify these issues by dividing the state into exclusive territories, granting a retail electric supplier exclusive rights to new electric service in those territories, and thus an incentive to provide service in those areas while limiting duplicative retail service facilities.[23] The exclusive rights granted to the retail electric supplier by section 158.25 of the RESCTA is qualified, however, by exceptions enumerated in the statute including the "large-load" exception at issue here.

¶11 The Legislature enacted the RESCTA to achieve very specific goals, enumerating them succinctly as follows:

It is hereby declared to be in the public interest that, in order to encourage the orderly development of coordinated statewide retail electric service, to avoid wasteful duplication of distribution facilities, to avoid unnecessary encumbering of the landscape of the State of Oklahoma, to prevent the waste of materials and natural resources, for the public convenience and necessity and to minimize disputes between retail electric suppliers which may result in inconvenience, diminished efficiency and higher costs in serving the consumer, the state be divided into geographical areas, establishing the unincorporated areas within which each retail electric supplier is to provide the retail electric service as provided in this act.

17 O.S. 2011, § 158.23. To effect this policy, the RESCTA created certified territories, stating:

Except as otherwise provided herein, each retail electric supplier shall have the exclusive right to furnish retail electric service to all electric-consuming facilities located within its certified territory, and shall not furnish, make available, render or extend its retail electric service to a consumer for use in electric-consuming facilities located within the certified territory of another retail electric supplier; provided that any retail electric supplier may extend its facilities through the certified territory of another retail electric supplier, if such extension is necessary for such supplier to connect any of its facilities or to serve its consumers within its own certified territory.

17 O.S. 2011, § 158.25(A). There are exceptions to a provider's exclusive service in its certified territory. One such exception is commonly referred to as the "large load" or "one megawatt" exception. The large-load exception states:

The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

17 O.S. 2011, § 158.25(E).

¶12 Since 1971, advances in technology, infrastructure, and federal regulation have provided widespread access to electric service and prompted a return to a competitive market.[24] Established in 1977, the Federal Energy Regulatory Commission (FERC) is the independent agency that regulates the interstate electricity market.[25] In 1996, the FERC, seeking to "remove impediments to competition" and "bring more efficient, lower cost power to the Nation's electricity consumers," issued Order No. 888, which required open-access trading in the wholesale transmission market.[26] Prior to Order No. 888, it was common for retail electric suppliers to use third-party transmission lines, but it was done by specific agreement between the parties rather than by regulatory mandate.[27] After Order No. 888, though, utility suppliers had to allow non-discriminatory access to transmission lines to unaffiliated utilities, enabling the utilities to use third-party transmission lines to transport electricity across the grid.[28]

¶13 A year after the FERC issued Order No. 888, the Oklahoma Legislature enacted the Electric Restructuring Act of 1997. While the Restructuring Act recognized that "[m]onopoly utility regulation has been used as a substitute for competition in the supply of electricity," changes in the marketplace and technology as well as FERC Order No. 888 "have resulted in increased competition in the electric generation industry." 17 O.S. 2011, § 190.2. The Legislature launched a study and task force devoted to developing a framework for a restructured industry. 17 O.S. 2011, § 190.4; see also 17 O.S. 2011, § 190.21. Even though they launched this study, the Legislature did not adopt a restructuring plan, did not repeal the Restructuring Act, nor did it amend the language of the RESCTA to address the changes in the electric marketplace or technology. The Legislature stood silent as to the manner and method required for "extending its service" as utilized in 17 O.S. 2011, § 158.25(E).

¶14 The respective sides suggest competing interpretations of the phrase "extending its service" as used in the large-load exception. If a statute is subject to more than one interpretation, we look to the plain and ordinary meaning of words in a statute unless the Legislature defines the term. In the Matter of the Income Tax Protest of Hare, 2017 OK 60, ¶ 10, 398 P.3d 317, 320. We also look at the act as a whole, considering its general purpose to determine the legislative intent behind its enactment, and give the statute a reasonable and sensible construction that will avoid absurd consequences. McIntosh v. Watkins, 2019 OK 6, ¶ 4, 441 P.3d 1094, 1096.

The plain meaning of "extending its service."

¶15 In construing the phrase "extending its service," we first look at the ordinary definition of the words used in the phrase. "Extend" has several meanings including: to spread or stretch forth; to proffer; to make available; or to advance. Merriam-Webster, https://www.merriam-webster.com/dictionary/extend (last visited Dec. 19, 2022). "Its" is defined as of or relating to it or itself. Merriam-Webster, https://www.merriam-webster.com/dictionary/its (last visited Dec. 19, 2022). "Service," in this context, means a facility supplying some public demand. Merriam-Webster, https://www.merriam-webster.com/dictionary/service (last visited Dec. 19, 2022).

Extend is synonymous with furnish, make available, and render.

¶16 "A statute must be read to render every part operative and to avoid rendering parts thereof superfluous or useless." Am. Airlines, Inc. v. Okla. Tax Comm'n, 2014 OK 95, ¶ 41, 341 P.3d 56. Despite this rule limiting superfluous language, it is also common for a statute to utilize and string together synonyms to stave off arguments based on any perceived loopholes. United States v. Costello, 666 F.3d 1040, 1048 (7th Cir. 2012).

¶17 In its Order, the Commission based its definition of the word "extending" on the premise that if "extend" was interpreted to mean furnish or make available, other words in the RESCTA--"furnish," "make available," and "render"--would be superfluous.[29] The Commission asserts that because each of these words is used in the statute, they must have differing meanings. Yet these words are synonymous with one another. This string of synonyms is used when prohibiting conduct, indicating an intent to avoid any omission. Whereas, only a single word is used when allowing conduct.[30] As such, it would be inappropriate to imbue these synonymous words with distinct meaning and interpret the large-load exception in this manner.

The definition of the phrase "extending its service" must be consistent with the intent of the RESCTA.

¶18 "Extending" requires consideration of the Legislative intent in enacting the RESCTA. In enacting the RESCTA, the Legislature specifically wanted to "avoid wasteful duplication of distribution facilities"; "avoid unnecessary encumbering of the landscape of the State of Oklahoma"; "prevent waste of materials and natural resources"; and "minimize disputes between retail electric suppliers which may result in inconvenience, diminished efficiency and higher costs in serving the consumer." 17 O.S. 2011, § 158.23.

¶19 OG&E proposed to utilize WFEC's transmission lines to provide retail electric service to the Binger II. It should be noted, CKE proposed to use the same WFEC transmission lines to provide retail electric service to the Binger II.[31] The Commission's Administrative Law Judge stated in their Report and Recommendation that, even interconnecting with WFEC's transmission lines,

Plainly, OG&E is offering its services to the Pump Station. Moreover, in constructing infrastructure to service ONEOK's Pump Station or otherwise availing itself of rights to open-access transmission specifically authorized by the Federal Energy Regulatory Commission ("FERC"), OG&E is making its service available to ONEOK. Likewise, in constructing infrastructure to service ONEOK's Pump Station, OG&E is causing its service and not that of a third party to reach ONEOK's point of electricity consumption.[32]

The Commission held, however, that OG&E could not utilize a third-party's transmission facilities to serve the Binger II.[33]

¶20 On appeal, ONEOK and OG&E assert that the ALJ's conclusion was correct. We agree. The Commission's interpretation runs counter to the RESCTA's policies of reducing wasteful duplication of distribution facilities, encumbering the Oklahoma landscape, and wasting materials. First, if OG&E were compelled to run distribution lines from its nearest distribution facility, it would require the encumbrance of at least nine miles of Oklahoma landscape.[34] Running such distribution lines would also be wasteful of materials and natural resources because there are existing open-access transmission lines which OG&E may utilize near the Binger II.[35] The additional lines would also require a higher cost for the customer, ONEOK, as the favorable pricing that OG&E offered due to its use of a third-party's transmission lines would be negated.[36]

¶21 The Commission asserts that allowing OG&E to have an "island" in CKE's certified territory would be a wasteful duplication of distribution facilities and it therefore violates the RESCTA.[37] This is so because OG&E would have to build infrastructure to use WFEC's transmission lines to service the Binger II, whereas CKE has a previously-built substation already in place in the vicinity of the Binger II.[38] While the proposed OG&E substation may be a duplication of distribution facilities, it is a question of whether the duplicate distribution facility would be wasteful. In order to be wasteful, the duplicate facility would have to be "given to or characterized by useless consumption or expenditure." Dictionary.com, https://www.dictionary.com/browse/wasteful (last accessed Dec. 19, 2022). Both OG&E and PSO, an amici in this case, assert that interconnecting with transmission lines to provide retail electric service to a substation is generally the manner in which large loads are serviced.[39] Even CKE, which would be utilizing WFEC's transmission lines, would have to upgrade their current facilities in order to properly service the large load.[40] Therefore, a facility would not be useless, nor would the expenditure of costs or materials, as each would be necessary regardless of the company awarded the contract. While it may be a duplication of facilities, it is not a wasteful duplication, and is therefore not a violation of the RESCTA.

¶22 An analogy may be of assistance here. OG&E is proposing to interconnect with open-access transmission lines that are federally regulated. From that interconnection, OG&E will then run its own distribution lines to a substation and the Binger II. We can liken this to a highway. If OG&E were building a road that led to the Binger II, we would not require them to build a new road if there is already a highway that was closer and more readily available. We would expect OG&E to use the existing highway and build an extension from there. The issue is no different here.

The large-load exception must be given force and effect.

¶23 Cooperatives have exclusive rights in all other spaces, and must be available to service all loads in their territory, even undesirable or unprofitable loads.[41] CKE and the amici argue that this requirement--providing service for all loads--is the public policy supporting a narrow construction of the large-load exception which would necessarily eliminate competition. By eliminating competition, rural cooperatives could recoup certain costs of doing business in the area by servicing these lucrative loads.[42] Both the Commission and CKE seek to impose additional limitations on the large-load exception which is not found in the statute, arguing that it is only applicable at the "seams" or where another retail electric supplier is already in the area.[43]

¶24 While the RESCTA established certified territories in order to service unincorporated areas, at the same time, the Legislature enacted the large-load exception. The large-load exception specifically states that the RESCTA does not preclude any retail electric supplier from extending its service to a large load. 17 O.S. 2011, § 158.25(E). The certified territories with the exception for large loads (which allows any retail electric supplier to service such loads) were part of the original Act in 1971 and has never been amended or revised.

¶25 On one hand, CKE contends that "the RESCTA was enacted specifically to ensure rural Oklahomans have access to affordable, reliable, and efficient electric service."[44] On the other hand, CKE ignores the fact that ONEOK is a rural retail electric customer in this instance. CKE's bid was millions of dollars more than OG&E's. Interpreting the exception as CKE asserts would eliminate all competition, which arguably drives up costs for large customers in order to subsidize the cooperative's other electric consumers.[45]

¶26 There is also nothing in the statute that supports the "seams" argument that CKE puts forward. The plain language of the statute provides that any retail electric supplier may provide service to large loads.[46] Because the RESCTA grants exclusive rights to retail electric suppliers in unincorporated territories, it would be nearly impossible for another supplier to already be in the area. If this reading was enforced, it would render the large-load exception largely inoperable. Construing this language to mean only a retail electric supplier who operates at the "seams" of the territories or where a retail electric supplier is already in the area would be wholly contrary to the legislative intent and plain language of the exception.

If the Legislature wanted to limit the manner and method of providing service under the large-load exception, they could have.

¶27 "We presume that the Legislature expressed its intent and intended what it expressed, and statutes are interpreted to attain that purpose and end, championing the broad public policy purposes underlying them." Estes v. ConocoPhillips Co., 2008 OK 21, ¶ 16, 184 P.3d 518, 525. "It is not the function of the courts to add new provisions which the legislature chose to withhold." Pentagon Acad., Inc. v. Ind. Sch. Dist. No. 1 of Tulsa County, 2003 OK 98, ¶19, 82 P.3d 587, 591.

¶28 The Commission and CKE rely on OG&E v. Kay Elec. Co-op, 1974 OK 24, 519 P.2d 905, due to the Court's differentiation between distribution and transmission lines.[47] Kay Electric was decided before the Commission had prepared maps showing each supplier's certified territory. OG&E filed an action with the Commission seeking to service a new facility because OG&E had an existing 24 kilovolt line that was in closer proximity to the facility than Kay Electric's nearest existing 7.2KV line. OG&E asserted that the 24KV line met the definition of an "existing distribution line" as contemplated by 17 O.S. 2011, § 158.25(B), so that OG&E could provide retail service in the area. Id. ¶ 1, 519 P.2d at 906. In a prior proceeding, the Commission determined that a 24 KV (or above) line was presumed to be a transmission line and lines of lesser voltage would be presumed to be distribution lines. In order to fit the definition of a distribution line, OG&E relied on evidence that the 24KV line serviced 45 rural customers in addition to the non-rural retail customers. In the specific segment near the new facility, OG&E serviced three customers that took electricity directly from the 24 KV line. The Commission concluded that the disagreement as to the meaning of the term "substantial use" found in §158.22(3)(b) necessitated the establishment of standards to apply to seven specific situations.[48] Applying the standards to this case, the Commission determined that part of the 24 KV line was a distribution line, whereas another part was a transmission line. Id. ¶ 11, 519 P.2d at 907. On appeal, OG&E argued that the Act makes no distinction between distribution and transmission lines but only between retail and wholesale electric service.[49] However, our Court approved the standard applied and affirmed the Commission's determination in favor of Kay Electric. The Court cited a case from Minnesota, which described the difference between distribution and transmission lines.[50] The Court concluded that when the Legislature utilized the term "distribution lines," "the legislature intended to recognize the common usage distinction between 'transmission' and 'distribution' lines" and approved the decision of the Commission which determined that one high voltage line could be used for both transmission and distribution, based on the purpose for which the line is used. Id. ¶ 19, 519 P.2d at 909.

¶29 Kay Electric is instructive because the Legislature, well versed on the distinction between transmission and distribution lines, chose not to make a distinction in the exception at issue as to the manner in which large loads may be serviced. Kay Electric also stands for the proposition that one line can be used for different purposes.

¶30 CKE asserts that OG&E's use of wholesale transmission lines excludes it from providing retail electric service.[51] This assertion is incompatible with Kay Electric. Pursuant to Kay Electric, the type of line is determined based on the purpose for which the line is used. In this case, while the WFEC line is undisputedly an open-access transmission line delivering wholesale electric energy, there is no indication in the record that OG&E is purchasing electricity for wholesale to a third party. OG&E proposes to use the line only to deliver retail electric service to the Binger II.[52]

¶31 The Commission also argues that the manner in which service may be extended is limited to use of the technology available at the time of the enactment of the RESCTA in 1971. To the extent technology existing at enactment could implicitly limit approved methods of extending service, the Legislature directed it should not: "This act shall be construed liberally. The enumeration of any object, purpose, power, manner, method or thing shall not be deemed to exclude like or similar objects, purposes, powers, manners, methods or things." 17 O.S. 2011, § 158.31. Open access to shared resources did not exist in 1971, so it would have been impossible for the enacting Legislature to bar its use in extending service under section 158.25(E). In 1997, however, the Legislature recognized the existence of open access resources,[53] but still did not place any restrictions on the manner or method of providing service under the large load exception. Moreover, allowing access to shared resources furthers the common purposes of the RESCTA and the Electric Restructuring Act of 1997. Since 1997, the use of transmission lines and power-sharing markets have led to decreased duplication of facilities and lowered the cost of electric service to consumers.[54] Retail electric suppliers have been utilizing transmission lines to provide service under the large load exception for years with the knowledge of the Commission.[55] We therefore decline to impose such a restriction now.

Conclusion

¶32 The Commission's interpretation of 17 O.S.2011, § 158.25(E) to prohibit OG&E from extending its retail electric service to the Binger II is in error. We hold that section 158.25(E) allows OG&E to extend its service to large loads in the manner proposed. The use of open-access transmission lines is not prohibited by the RESCTA. Therefore, we vacate the order of the Commission enjoining OG&E from serving or furnishing retail electric service to the Binger II directly from third-party transmission facilities.

ORDER OF THE OKLAHOMA CORPORATION COMMISSION ENJOINING OG&E IS VACATED; CAUSE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

Kauger, Winchester, Combs, Gurich and Kuehn, JJ., concur;

Kane, C.J. (by separate writing), Rowe, V.C.J., Darby (by separate writing), J., dissent;

Edmondson, J., disqualified.

FOOTNOTES

[1] Oklahoma Association of Electric Cooperatives ("OAEC") is an intervenor and has party status in case no. 117,896.

[2] R. at 915.

[3] R. at 588, 1009.

[4] R. at 1009.

[5] R. at 588, 1009.

[6] R. at 1009.

[7] R. at 1009.

[8] There is a discrepancy as to the difference between OG&E and CKE's bids. ONEOK asserts that there was an $11 million difference in proposals, whereas OG&E states the difference was $5 million.

[9] Distribution lines transport lower voltage electricity to neighborhoods and communities over a shorter distance while transmission lines transport bulk electricity at high voltages over vast distances. PG&E, Transmission v. distribution power lines, https://www.pge.com/en_US/safety/yard-safety/powerlines-and-trees/transmission-vs-distribution-power-lines.page (last visited Dec. 8, 2022).

[10] Nine miles by following the most direct path and fourteen miles by following roadways.

[11] R. at 1094.

[12] R. at 1093.

[13] R. at 1093.

[14] OG&E filed its appeal in case no. 117,896 on April 10, 2019, and ONEOK filed its appeal in case no. 117,902 on April 11, 2019. We consolidated the appeals on April 29, 2019.

[15] Cox Oklahoma Telecom, LLV v. State ex rel. Okla. Corp. Comm'n, 2007 OK 55, ¶ 9, 164 P.3d 150, 156 ("Because Commission decisions often involve complex issues of economics, accounting, engineering, and other special fields of knowledge, a presumption of correctness accompanies the Commission's findings in matters it frequently adjudicates and in which it possesses expertise.").

[16] Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97, 714 P.2d 1013 (holding that Commission's longstanding construction of a statute "must be given great weight."); Schulte Oil Co., Inc. v. Okla. Tax Comm'n, 1994 OK 103, ¶ 4, 882 P.2d 65, 68 (stating that because there was no support in the record for any "prior, firmly established Commission policy" (i.e. longstanding policy), the Court had to decide the case on other grounds). See Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97, ¶ 9, 714 P.2d 1013, 1015. It is imperative that such interpretations be longstanding so that the Legislature has notice of the Commission's interpretation, allowing the Legislature to either act or remain silent on the issue. See R.R. Tway, Inc. v. Okla. Tax Comm'n, 1995 OK 129, ¶ 12 n.3, 910 P.2d 972, 976 n.3. If the Legislature knows of the longstanding administrative construction, but remains silent, "such silence may be regarded as acquiescence in or approval of the administrative construction." Oral Roberts, 1985 OK 97, ¶ 17, 714 P.2d at 1016. The Court shows deference to such a longstanding interpretation because "great interests have grown up under it and will be disturbed or destroyed by the announcement of a new rule." Id. ¶ 10, 714 P.2d at 1015 (citation omitted).

[17] CKE and the Commission's reliance on Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Comm'n, 2005 OK 47, ¶ 8, 115 P.3d 861, 869, for the assertion that the Commission is owed deference is misguided. In Public Service Co., the Court gave deference to the Commission's factual findings, not its legal conclusions. The Court held that a deferential standard was appropriate for this decision "[b]ecause Commission decisions often involve complex issues of economics, accounting, engineering, and other special knowledge." Id. When reviewing the Commission's factual findings, "a presumption of correctness accompanies the Commission's findings in matters it frequently adjudicates and in which it possesses expertise." Id. Here, we are not reviewing the Commission's factual findings in which it possesses expertise, but rather its legal conclusions which are the expertise of the Court. Robinson v. Fairview Fellowship Home for Senior Citizens, Inc., 2016 OK 42, ¶ 13, 371 P.3d 477, 483 ("This Court is the ultimate authority on the interpretation of the laws of this state."); see also Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2017 OK CIV APP 16, ¶ 15, 392 P.3d 295, 303 (approved for publ'n by Okla. Sup. Crt.) ("This is simply a matter of determining what a statute means, and that is within the expertise of the courts.").

[18] Parties from both sides of this issue have asserted that this is a case of first impression. R. at 300, CKE Mot. for Temporary Inj. ("The issue before the Commission in the Cause is one of great importance and one that has not been heard or resolved by the Commission to date, to the knowledge of CKenergy."); R. at 308, Okla. Assoc. of Elec. Coop's Mot. to Dismiss ("To the knowledge of counsel for OEAC, this is a case of first impression, and more importantly, the cause seeks to address unanswered issues arising from significant changes in industry practices, which in turn give rise to CKenergy's request for relief."); Appellant OG&E's Br. in Chief 8 ("the agency's interpretation has been adopted for the first time in the course of litigation. . . .").

[19] The record presents evidence that the Commission has previously allowed OG&E to provide service in certified territories via third-party transmission lines. R. at 533 ("I am aware that OG&E is serving 1,000 kW load in other Oklahoma rural electric cooperatives' certified territories by means other than by extending OG&E's service."), 1098--99 ("OG&E is currently providing (or is contracted to provide) service to nearly one dozen other customers in a similar manner under this exception; and not once has such an objection been raised."), 1102. See also Appellant OG&E's Br. in Chief 1, OG&E v. State ex rel. Okla. Corp. Comm'n, No. 118,857 (Okla. filed Nov. 16, 2020) ("OG&E and other suppliers have been tapping into nearby transmission lines and building dedicated substations to serve such loads for decades.").

The Commission's rulings in at least two companion cases, numbers 119,054 and 119,083, also show that the Corporation Commission has allowed waiver of its perceived violations of the RESCTA. In those cases, the Commission found in favor of OG&E and allowed it to provide service through third-party transmission lines.

[20] Both OG&E and ONG assert similar arguments in this case. For purposes of this opinion when "OG&E" is referenced going forward, it is referencing both OG&E and ONEOK unless otherwise noted.

[21] See Amicus Curiae Okla. Farm Bureau Legal Found., et al. Br. 14 ("The RECA was a foundational moment in Oklahoma history because it allowed rural Oklahomans to provide for their own electrical needs in the vast stretches of rural Oklahoma where for-profit utilities, like OG&E, refused to serve because it could not make a profit for its investors. . . .").

[22] Appellee CKE Answer Br. 6.

[23] Id.

[24] See Appellant ONEOK Opening Br. 5.

[25] Id. at 4.

[26] Id.

[27] Appellant OG&E Reply Br. 16.

[28] Appellant ONEOK Opening Br. 4--5.

[29] R. at 1093 ("THE COMMISSION FURTHER FINDS that interpreting 17 O.S. § 158.25(E) as proposed by OG&E and ONEOK would require an interpretation of the statute that 'extend its service' means the same thing as furnishing electricity, or simply providing or offering electricity, which would violate the rules of statutory construction because it would render other words in the statute useless.").

[30] Compare 17 O.S. 2011, § 158.25(A) ("shall not furnish, make available, render or extend its retail electric service. . . ."); 17 O.S. 2011, § 158.25(D) ("no retail electric supplier shall furnish, make available, render or extend electric retail service. . . .") with 17 O.S. 2011, § 158.25(B) ("shall be furnished retail electric service . . ."); 17 O.S. 2011, § 158.25(E) ("The provisions of this act shall not preclude any retail electric supplier from extending its service. . . .").

[31] See R. at 100, 131, 1021. (CKE would serve the Binger II by running distribution lines from the substation located across the road from the Binger II. That substation is served by CKE's distribution lines which connect to WFEC's transmission lines).

[32] R. at 920.

[33] R. at 1093 ("THE COMMISSION FURTHER FINDS that OG&E does not intend to "extend" its retail distribution system to serve the Pump Station. Rather, OG&E intends to access third-party transmission facilities to serve the Pump Station. Therefore, the RESCTA prohibits OG&E from serving the Pump Station in the manner in which OG&E intends to serve.").

[34] R. at 479--80.

[35] R. at 480 (OG&E "has sought to add a new delivery point through the SPP so that it can connect to WFEC's transmission line and then build one mile of transmission line and substation. . . .").

[36] Appellant ONEOK Opening Br. 17. CKE challenged OG&E's favorable pricing by presenting testimony regarding OG&E's Allowable Expenditure Formula before the ALJ. R. at 926--38. In its brief, OAEC also challenged OG&E's pricing, stating: "Without regard to the complex economics or for-profit rate making, the simple and unavoidable fact is that the infrastructure to take electricity from a high voltage transmission line, step it down to retail levels, and deliver it to a single non-contiguously located customer is not cheap." OAEC's Resp. to Appellant's Br. in Chief 20. While OAEC may dispute the accuracy of OG&E's formula, it does not dispute that OG&E is a retail electric supplier seeking approval to supply retail electric service to the ONEOK facility.

[37] See Appellee Comm'n Answer Br. 11.

[38] See Appellee Comm'n Answer Br. 19.

[39] R. at 468 ("PSO further mentioned that larger loads like the one at issue in this case are commonly served off of transmission lines."), 1098--99, 1102; Appellant OG&E's Br. in Chief 10.

[40] R. at 489.

[41] See Amicus Curiae Okla. Farm Bureau Legal Found., et al. Br. 15

[42] R. at 483.

[43] Appellee CKE Answer Br. 21; Appellee Comm'n Answer Br. 14.

[44] Combined Ans. Br. of Appellee CKE 23.

[45] ONEOK Arbuckle II Pipeline, LLC's Reply Br. 14--15.

[46] 17 O.S. 2011, § 158.25(E) states in pertinent part: "The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act . . . subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger."

[47] When the RESCTA was enacted in 1971, the Commission was tasked with determining the boundaries of the certified territories. Each boundary was set with regard to existing distribution lines. 17 O.S. 2011, § 158.24(B).The Act required suppliers to file a map with the Commission showing existing distribution lines. The Commission was then required to prepare maps establishing unincorporated areas within which each supplier had the exclusive right to provide electric service. Kay Electric, 1974 OK 24, ¶ 3, 519 P.2d 905, 906--07.

[48] The Legislature defined an existing distribution line as a line that "is located in an unincorporated area" and "is being or has been substantially used for retail electric service." 17 O.S. 2011, § 158.22(3). For new electric-consuming facilities in unincorporated territories which had not yet been included within a certified territory, the retail electric supplier with the closest existing distribution line would provide service. 17 O.S.2011, § 158.25(B).

[49] Under the Act, retail electric service is defined as "electric service furnished to a consumer for ultimate consumption, but does not include wholesale electric energy furnished by an electric supplier to another electric supplier for resale." 17 O.S. 2011, § 158.22(4).

[50] Kay Electric specifically states:

In determining what the legislature meant by * * * the terms `distribution line' and `transmission line' * * * we are guided by § 645.08(1) which provides that, in construing statutes, words and phrases are to be understood according to their common and approved usage. * * *

The state Tax Commission construes transmission lines to be those which take the current from the point of delivery * * * and deliver it in bulk to a point or points for distribution. The interpretation * * * seems to be in accord with the common usage of the terms. * * * The dictionary definitions of the two terms are in accord with the notion that transmission lines are those that transfer current from one place to another but do not divide or apportion it among the consumers, while the distribution lines are engaged only in the latter function. * * *

The distinction between the terms * * * lies in the primary objective and purpose for which the line is used. It is apparent that the primary objective and purpose of the 22,000-volt line in question is the transfer of large quantities of electrical energy in bulk to locations from which it may be distributed or allocated to consumers by means of other lines.

1974 OK 24, ¶ 18, 519 P.2d 905, 909 (citation omitted).

[51] Combined Ans. Br. of Appellee CKE 23.

[52] Supra note 36. The dissent relies on the testimony of CKE's expert, David W. Hedrick, who challenged the Allowable Expenditure Formula used to calculate the cost of OG&E providing service to ONEOK's new load. There is no dispute that OG&E would pay a "tap fee" for the use of WFEC's transmission line. This testimony addressed why OG&E's bid was millions of dollars lower than CKE's bid. However, CKE's expert admitted "A thorough review and analysis of the assumption and cost of service methodology is beyond the scope of this proceeding, but the concerns are legitimate and should be reviewed by the OCC." R. at 938.

[53] 17 O.S.2011, § 190.2 states:

Monopoly utility regulation has been used as a substitute for competition in the supply of electricity, but recent changes in the energy marketplace and technology as well as the passage of the National Energy Policy Act of 1992 and implementation of Order No. 888 by the Federal Energy Regulatory Commission have resulted in increased competition in the electric generation industry. The introduction of consumer choice in retail electric energy suppliers will result in market forces rather than regulation determining the cost and quality of electricity for all consumers.

[54] Amicus Curiae Pub. Serv. Co. of Okla. Br. 8, 15.

[55] R. at 1098, 1102; Apellant OG&E Br. in Chief 10.

 

 

Kane, C.J., dissenting:

¶1 This dispute involves application of the ''one-megawatt exception'' to the Retail Electric Suppliers Certified Territories Act (RESCTA). The RESCTA provides:

"The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger."

17 O.S. 2011, § 158.25(E). The issue presented is whether a retail electric supplier is "extending its service" for purposes of the one megawatt exception when employing existing third party transmission lines to supply service within a certified territory not otherwise reachable by said supplier. This use of third party transmission lines was not permitted when the RESCTA was drafted in 1971.[1]

¶2 The Oklahoma Corporation Commission correctly applied the above statute, and concluded that it was not designed to allow large outside utilities to ''cherry pick'' electrical loads by the use of third party transmission lines located in certified territories. Appellant is not ''extending'' service in such a scenario, it is tapping into the infrastructure built and maintained by the local electric cooperatives. This approach allowed Appellant to forego the expense of building nine to fourteen miles of new lines, which undoubtedly played into the ability of Appellant to undercut the existing rural supplier by five million dollars in the bidding process.

¶3 The statutory construction employed by the majority creates an exception not foreseen by the legislature, and which will serve to burden the same rural community electric suppliers that the RESCTA sought to protect. Given the fact that it was impossible for a retail electric supplier to ''extend its service'' by the use of third-party transmission lines at the time of the drafting of the RESCTA, I find it an unreasonable construction of the Act to allow a competing electric supplier to ''extend'' into this certified zone in such a fashion at this time. I dissent.

FOOTNOTES

[1] See Amicus Curiae Okla. Farm Bureau Legal Found., et al. Br. 11

 

 

Darby, J., dissenting:

¶1 The issue in this case concerns the construction of a statute. This court must affirm if the Commission "regularly pursued its authority" and its "findings and conclusions . . . are sustained by the law." Okla. Const. art. 9, § 20. Unless otherwise provided, the Oklahoma Constitution provides the standards of review for two categories of cases appealed from the Corporation Commission: 1) those involving violations of Constitutional rights and 2) all other appeals. Okla. Const. art. 9, § 20. Cases involving the first category receive de novo review. Id. All other cases receive a deferential standard of review. Id.; see also Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Comm'n, 2005 OK 47, ¶ 8, 115 P.3d 861, 869-70. The Oklahoma Constitutional standards of review for the two categories of cases are as follows:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.

Okla. Cost. art. 9, § 20 (emphasis added). This case does not involve an asserted violation of any constitutional right; consequently, the second standard of review is applicable. The Majority incorrectly equates the more deferential ("[i]n all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence") with "de novo." Maj. Op. at ¶ 7. This the Court should not do. The Majority's illogical mathematical proof leaves much to be desired, especially when this Court has not clearly spoken to what it means for a Commission order to be "sustained by law." The Majority's case cited for the standard of review, originally decided by the Court of Civil Appeals, Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2017 OK CIV APP 16, 392 P.3d 295 (approved for publ'n by Okla. Sup. Ct.), makes its statement concerning the constitutional standard[1] without citation to authority and then proceeds to cite a non-Corporation Commission, non-agency case, for the general proposition that "[l]egal issues involving statutory interpretation are subject to de novo review." Id. citing Heffron v. Dist. Court of Okla. Cnty, 2003 OK 75, ¶ 15, 77 P.3d 1069. Claiming to employ de novo review, the Majority finds an ambiguity, and tries to interpret the statute using plain language alone rather than using recognized canons of construction. The Majority concludes that the statute does not limit the manner or method of providing service under the large-load exception. I respectfully dissent.

¶2 To ensure each unrestricted territory receives adequate energy supplies, the Legislature guaranteed individual small energy companies exclusive authority to provide energy to consumers within their respective territory. The statutes allow a limited exception for providing service to large loads. The Majority overlooks the guiding purpose in creating the territorial monopolies and replaces its judgment for that of the Legislature.

¶3 In reality the language and statutory definitions in 17 O.S. 2011, §§ 158.22 and 158.25 can mean only one thing--that "extending its service" means "extending [any retail electric supplier's] service"--and "retail electric service" specifically excludes wholesale electric energy. Consequently, I would affirm the Corporation Commission.

¶4 The Majority cites Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97, 714 P.2d 1013 (hereinafter ORU), for the rule concerning deference to an agency's interpretation. Maj. Op. at ¶ 8. The rule is as follows: Courts will not disturb the administrative construction of an ambiguous or uncertain statute by the agency charged with its administration so long as such construction is reasonable. ORU, ¶¶ 9-10. But the Majority conflates ORU's holding with the rule. Despite the Majority's position, an agency's interpretation does not need to be long-standing in order to receive deference. See id.

[I]nterpretation or construction of an ambiguous or uncertain statute by the agency charged with its administration is entitled to the highest respect from the courts, specially when the administrative construction is definitely settled and uniformly applied for a number of years. In such cases the administrative construction will not be disturbed except for very cogent reasons, provided that the construction so given was reasonable.

Id. at ¶ 9. There is a type of hierarchy of deference, with long-standing interpretations of regulations given the most controlling weight. See Bell v. Phillips Petroleum Co., 1982 OK 28, ¶ 24, 641 P.2d 1115, 1121-22.

When more than one meaning may be attributed to the terms of a regulation, we look to the interpretation given to the regulation by those charged with the duty of executing it. When choosing between two or more possible meanings, controlling weight may be given to the long-continued administrative usage unless it is plainly erroneous or inconsistent with the language. Deference to an agency's interpretation is even more clearly in order when the construction is that of an administrative regulation rather than a statute.

Id. (footnotes omitted). It is true that length of time contributes to the amount of deference, but it does not determine whether deference is owed. In ORU the rule concerning deference to agency interpretation comes from the 1930 case McCain v. State Election Bd., 144 Okl. 85, 289 P. 759 (1930):

It is a well settled rule that the contemporaneous construction of a statute by those charged with its execution and application, especially when it has long prevailed, while not controlling, is entitled to great weight and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous. The courts are especially reluctant to overturn a long standing executive or departmental construction where great interests have grown up under it and will be disturbed or destroyed by the announcement of a new rule, or where parties who have contracted with the government upon the faith of such construction will be prejudiced.

Id. 762-63 citing 25 Ruling Case Law 1043, ¶ 274.

Ultimately the rule, stated without discussion of additional reasons to differently weigh interpretations (long-standing nature, contemporaneous construction), is well put in the famous United States Supreme Court case Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The rule is summarized as follows:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. at 2781-82 (footnotes omitted).

¶5 In this case, under the more deferential constitutional standard of review,[2] we need not use the rule to defer to an agency's construction of an ambiguous statute or regulation because the intent of the Legislature is made clear; there is no ambiguity as regular canons of construction lead us to the conclusion that "its service" refers to "retail electric service." § 158.22(4). Thus, the Commission's decision will be upheld so long as it is within the Commission's authority and sustained by law. Okla. Cost. art. 9, § 20.

¶6 The pertinent part of subsection E states that "[t]he provisions of this act shall not preclude any retail electric supplier from extending its service. . . ." § 158.27(E). The question raised has been the construction of "extending its service." Maj. Op. at ¶¶ 7-9 (emphasis added). This Court should deploy well known canons of construction to hold "extending its service" means extending "retail electric service," which specifically excludes wholesale, or "energy furnished by an electric supplier to another electric supplier for resale." § 158.22(4).[3]

¶7 The first canon this Court should use is a semantic canon regarding the ordinary meaning of words. "Words are to be understood in their ordinary, everyday meanings--unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012). The Majority recites this canon but fails to properly apply it. See Maj. Op. at ¶ 15 ("If a statute is subject to more than one interpretation, we look to the plain and ordinary meaning of words in a statute unless the Legislature defines the term. In the Matter of the Income Tax Protest of Hare, 2017 OK 60, ¶ 10, 398 P.3d 317, 320.). "Where the text is addressing a scientific or technical subject, a specialized meaning is to be expected: 'In terms of art which are above the comprehension of the general bulk of mankind, recourse, for explanation must be had to those, who are most experienced in that art.'" Reading Law 73. We are dealing with a technical subject in this case. In reviewing § 158.25, several statutorily defined terms are used throughout. Important to the question presented here, "retail electric supplier" and "retail electric service" are defined by statute at § 158.22.

The term "retail electric supplier" means any person, firm, corporation, association or cooperative corporation, exclusive of municipal corporations or beneficial trusts thereof, engaged in the furnishing of retail electric service.

The term "retail electric service" means electric service furnished to a consumer for ultimate consumption, but does not include wholesale electric energy furnished by an electric supplier to another electric supplier for resale.

§ 158.22(1), § 158.22(4) (emphasis added).

¶8 In § 158.25 the term "retail electric service" is used six (6) times throughout the statute and the shortened term "service" is used twice. Contextually, "[a] word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Reading Law 170. In this case the Court is reviewing one of the two instances in which only "service" is used in the statute. But, using the last-antecedent canon, one that is essentially a rule of grammar, we find that in both instances that "retail electric service" is the antecedent of the legalistic pronoun such, § 158.25(D), and the possessive determiner (type of pronoun) its, § 158.25(E). See Reading Law 144 (the last-antecedent canon provides: "A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent.") That is, "such" and "its" refer to the earlier antecedents "retail electric service" and "retail electric supplier," respectively. To wit,

D. Except as provided in Section 5 C, no retail electric supplier shall furnish, make available, render or extend retail electric service to any electric-consuming facility to which such service is being lawfully furnished by another retail electric supplier on the effective date of this act, or to which retail electric service is lawfully commenced thereafter in accordance with this section by another retail electric supplier.

E. The provisions of this act shall not preclude any retail electric supplier from extending its service after the effective date of this act (1) to its own property and facilities, in an unincorporated area, and (2) subject to Section 5 D, to an electric-consuming facility requiring electric service, in an unincorporated area, if the connected load for initial full operation of such electric-consuming facility is to be 1,000 kw or larger.

§ 158.25(D), § 158.25(E) (emphasis added).

¶9 As a final effort, the Majority claims that there is no evidence that OG&E is purchasing energy from WFEC by using their transmission lines. Maj. Op. at ¶ 30. Instead of an altruistic WFEC, we actually do have testimonial evidence discussing the methodology for calculating certain costs and payment of "tap fees" from OG&E to WFEC. Testimony of Bruce Breshears on behalf of OG&E discusses a calculation of the annual customer payment. It includes "taking the annual bill (customer charge, energy charge, and demand charge) to get an incremental annual bill less the charges from [sic] paid by OG&E to Western Farmers Electric Cooperative." Report and Recommendation of the Administrative Law Judge p. 19. There is also discussion of a "tap fee" as affecting annual revenue. See Report and Recommendation of Administrative Law Judge p. 29. The tap fee paid by OG&E to WFEC increases as the load increases, which ultimately affects OG&E's bottom line.[4]

¶10 "Extend its service" has a technical meaning defined by the Legislature and should not be read in the ordinary sense. To do so replaces the Legislature's judgment. Additionally, it nullifies in large part the purpose of the monopoly by allowing any retail electric supplier to tap into another's distribution lines or infrastructure to reach into another retail electric supplier's certified territory. It allows any retail electric supplier to cherry pick only the very best, most economical loads to serve. Permitting this crushes retail electric suppliers in their respective certified territories. It also economically damages co-ops in rural Oklahoma and those customers who are served by cost of service electric co-ops. To allow any retail electric supplier to buffet-style pick the most profitable economic loads to serve leaves co-ops as the provider of last resort, drives the cost up for rural customers, and runs completely counter to the desired statutory goals.

¶11 I respectfully dissent.

FOOTNOTES

[1] The Dobson Court said "[w]hether this court exercises its 'independent judgment' as to the Commission's statutory interpretation or reviews that interpretation to determine whether it is 'sustained by the law,' our review is the same and no different than the de novo review we employ regarding issues of law in other contexts." Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2017 OK CIV APP 16, ¶ 5, 392 P.3d 295, 298 (approved for publ'n by Okla. Sup. Ct.).

[2] Okla. Cost. art. 9, § 20 provides:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.

(emphasis added).

[3] The Majority's claim that there is "no indication in the record that OG&E is purchasing electricity for wholesale to a third party" is untrue. There was testimony about OG&E's Allowable Expenditure Formula which included discussion of the annual customer payment--that is OG&E's customer ONEOK. The witness discusses the annual bill less the charges paid by OG&E to Western Farmers Electric Cooperative for the cost of wholesale energy. See Report and Recommendation of Administrative Law Judge pp. 17-20.

[4] Testimony provides that "an incremental Tap Fee to connect to the WFEC transmission grid is removed from the annual revenue" as a reason why an OG&E equation is incorrect. Report and Recommendation of the Administrative Law Judge p. 29. The Witness testified it was his opinion that the revenue was overstated because "the Tap Fee used by OG&E is significantly understated. The incremental transmission cost associated with the new load would be equal to the load ratio share of WFEC's zonal transmission costs which results in a cost for the new load almost 3 and one-half times greater than that stated by OG&E. This additional cost would reduce the revenue available for use in OG&E's allowable expenditure calculation. . . ." Id.

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2017 OK CIV APP 16, 392 P.3d 295, 
DOBSON TELEPHONE CO. v. STATE ex rel. OKLA. CORPORATION COMM.
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1994 OK 103, 882 P.2d 65, 65 OBJ 3046, 
Schulte Oil Co., Inc. v. Oklahoma Tax Com'n
Discussed

 
1995 OK 129, 910 P.2d 972, 66 OBJ 3710, 
R.R. Tway, Inc. v. Oklahoma Tax Comm.
Discussed

 
1974 OK 24, 519 P.2d 905, 
OKLAHOMA GAS & ELECTRIC CO. v. KAY ELECTRIC COOP.
Discussed at Length

 
2003 OK 75, 77 P.3d 1069, 
HEFFRON v. DISTRICT COURT OF OKLAHOMA COUNTY
Discussed

 
2003 OK 98, 82 P.3d 587, 
THE PENTAGON ACADEMY, INC. v. INDEP. SCHOOL DIST. NO. 1 OF TULSA COUNTY
Discussed

 
2005 OK 47, 115 P.3d 861, 
PUBLIC SERVICE CO. OF OKLA. v. STATE ex rel. OKLA. CORP. COMM'N
Discussed at Length

 
1930 OK 323, 289 P. 759, 144 Okla. 85, 
McCAIN v. STATE ELECTION BD.
Discussed

 
2007 OK 55, 164 P.3d 150, 
COX OKLAHOMA TELECOM, LLC v. STATE ex rel. OKLAHOMA CORPORATION COMM'N.
Discussed

 
2008 OK 21, 184 P.3d 518, 
ESTES v. CONOCOPHILLIPS CO.
Discussed

 
2014 OK 95, 341 P.3d 56, 
AMERICAN AIRLINES, INC. v. STATE ex rel. OKLAHOMA TAX COMMISSION
Discussed at Length

 
2016 OK 42, 371 P.3d 477, 
ROBINSON v. FAIRVIEW FELLOWSHIP HOME FOR SENIOR CITIZENS, INC.
Discussed

 
2017 OK 60, 398 P.3d 317, 
IN THE MATTER OF THE INCOME TAX PROTEST OF HARE
Discussed at Length

 
2019 OK 6, 441 P.3d 1094, 
MCINTOSH v. WATKINS
Discussed

 
2019 OK 21, 441 P.3d 113, 
MEDICINE PARK TELEPHONE CO. v. OKLAHOMA CORPORATION COMMISSION
Discussed

 
2019 OK 27, 441 P.3d 147, 
DOBSON TELEPHONE CO. v. OKLAHOMA CORPORATION COMM.
Discussed

 
2022 OK 79, 518 P.3d 531, 
WESTERN HEIGHTS INDEPENDENT SCHOOL DISTRICT v. STATE
Discussed

 
1982 OK 28, 641 P.2d 1115, 
Bell v. Phillips Petroleum Co.
Discussed

 
1985 OK 97, 714 P.2d 1013, 56 OBJ 2777, 
Oral Roberts University v. Oklahoma Tax Com'n
Discussed at Length

Title 17. Corporation Commission

 
Cite
Name
Level

 
17 O.S. 190.21, 
Joint Electric Utility Restructuring Task Force
Cited

 
17 O.S. 158.21, 
Short Title
Discussed

 
17 O.S. 158.22, 
Definitions
Discussed at Length

 
17 O.S. 158.23, 
Geographical Areas
Discussed

 
17 O.S. 158.24, 
Fixing Boundaries of Certified Territories - Protests - Hearings by Commission
Cited

 
17 O.S. 158.25, 
Exclusive Rights within Territory - New Electric-Consuming Facilities - Rate Tariffs
Discussed at Length

 
17 O.S. 158.31, 
Liberal Construction
Cited

 
17 O.S. 190.2, 
Goals of a Restructured Electric Utility Industry
Discussed

 
17 O.S. 190.4, 
Electric Utility Industry Restructuring Study and Development
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA